[817 NE2d 341, 783 NYS2d 485]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEPHEN S. LaVALLE, Appellant.

Argued April 26, 2004; decided June 24, 2004

**POINTS OF COUNSEL**

*Kevin M. Doyle, Capital Defender,* New York City (*Daniel R. Williams, Christopher Seeds* and *Holly Handler* of counsel), for appellant. I. Doomed from the start, the trial took place in a

venue polluted by intense, localized publicity that prejudged Stephen LaValle's guilt and endorsed his execution. (*Irvin v Dowd,* 366 US 717; *People v Boss,* 261 AD2d 1; *Coleman v Kemp,* 778 F2d 1487; *People v Boudin,* 90 AD2d 253; *People v Acomb,* 94 AD2d 978; *United States v McVeigh,* 918 F Supp 1452; *Pamplin v Mason,* 364 F2d 1; *Groppi v Wisconsin,* 400 US 505; *Murphy v Florida,* 421 US 794; *People v Brensic,* 136 AD2d 169.) II. Jurors who believed Stephen LaValle guilty, felt allied with the victim, or could not consider a life sentence should have been excused for cause. (*Morgan v Illinois,* 504 US 719; *People v Culhane,* 33 NY2d 90; *People v Arnold,* 96 NY2d 358; *People v Johnson,* 94 NY2d 600; *People v Torpey,* 63 NY2d 361; *People v Chambers,* 97 NY2d 417; *People v Thigpen,* 277 AD2d 261; *People v White,* 275 AD2d 913; *Skipper v South Carolina,* 476 US 1; *Eddings v Oklahoma,* 455 US 104.) III. Despite the prosecution's skewed peremptory strikes against women, the trial court rejected the defense's demand for gender-neutral explanations. (*Batson v Kentucky,* 476 US 79; *J.E.B. v Alabama ex rel. T.B.,* 511 US 127; *People v Allen,* 86 NY2d 101; *People v Bolling,* 79 NY2d 317; *People v Jenkins,* 75 NY2d 550; *Overton v Newton,* 295 F3d 270; *United States v Alvarado,* 923 F2d 253; *United States v Chinchilla,* 874 F2d 695; *People v Blunt,* 162 AD2d 86; *People v Childress,* 81 NY2d 263.) IV. With the trial court's blessing, the prosecution withheld witness statements that discredited the core theory of its case. (*Brady v Maryland,* 373 US 83; *Boss v Pierce,* 263 F3d 734; *Leka v Portunondo,* 257 F3d 89; *United States v Severdija,* 790 F2d 1556; *United States ex rel. Thompson v Dye,* 221 F2d 763; *People v Cotto,* 28 AD2d 1116; *People v Morgan,* 178 Misc 2d 595; *United States v Bagley,* 473 US 667; *People v Vilardi,* 76 NY2d 67; *Strickler v Greene,* 527 US 263.) V. The prosecution argued falsely that no evidence existed that drugs or alcohol played a role in this crime. (*Miller v Pate,* 386 US 1; *Napue v Illinois,* 360 US 264; *People v Whalen,* 59 NY2d 273; *People v Paperno,* 54 NY2d 294; *People v Cotton,* 242 AD2d 638; *People v Negron,* 161 AD2d 537; *Brown v Borg,* 951 F2d 1011; *United States v Valentine,* 820 F2d 565; *Paxton v Ward,* 199 F3d 1197; *Jenkins v Artuz,* 294 F3d 284.) VI. The trial court erred when it refused to charge extreme emotional disturbance. (*People v Harris,* 95 NY2d 316; *People v Moye,* 66 NY2d 887; *People v Cassassa,* 49 NY2d 668; *Patterson v New York,* 432 US 197; *People v Butts,* 72 NY2d 746; *People v White,* 79 NY2d 900; *People v Martinez,* 186 AD2d 153; *People v Roche,* 98 NY2d 70; *People v Tabarez,* 69 NY2d 663; *People v Roldan,* 222 AD2d 132.) VII. The trial court partially and misleadingly

responded to a jury note asking whether state of mind was relevant to intent. (*People v Malloy,* 55 NY2d 296; *People v Almodovar,* 62 NY2d 126; *People v Gonzalez,* 293 NY 259; *People v Miller,* 6 NY2d 152; *People v Gezzo,* 307 NY 385; *People v Flynn,* 290 NY 220; *People v Panetta,* 250 AD2d 710; *Sandstrom v Montana,* 442 US 510; *People v Smalls,* 55 NY2d 407.) VIII. The jury should have been allowed to consider depraved indifference murder as a lesser included offense of first degree murder. (*People v Glover,* 57 NY2d 61; *People v Green,* 56 NY2d 427; *People v Sullivan,* 68 NY2d 495; *People v Register,* 60 NY2d 270; *People v Roe,* 74 NY2d 20; *People v Gallagher,* 69 NY2d 525; *People v Sanchez,* 98 NY2d 373; *People v Shuman,* 37 NY2d 302; *People v Mussenden,* 308 NY 558; *People v Asan,* 22 NY2d 526.) IX. Declaring the request was "absolutely insane" and "absolutely disastrous" and that it could not "in good conscience" allow it, the trial court erroneously rejected Stephen LaValle's request to represent himself. (*Faretta v California,* 422 US 806; *People v McIntyre,* 36 NY2d 10; *United States v Walker,* 142 F3d 103; *People v Smith,* 92 NY2d 516; *People v Arroyo,* 98 NY2d 101; *People v Davis,* 49 NY2d 114; *Williams v Bartlett,* 44 F3d 95; *United States v Hernandez,* 203 F3d 614; *Hacker v Herbert,* 825 F Supp 1143; *Wiesner v Abrams,* 726 F Supp 912, 909 F2d 1473.) X. Through improper joinder, the prosecution transformed the robbery charge into a story of a failed murder, thus enhancing its theme that Stephen LaValle was a predator in search of a victim. (*People v Robinson,* 68 NY2d 541; *People v Ely,* 68 NY2d 520; *People v Lane,* 56 NY2d 1; *People v Bongarzone,* 116 AD2d 164, 69 NY2d 892; *People v Hudy,* 73 NY2d 40; *Carmell v Texas,* 529 US 513; *People v Cronin,* 60 NY2d 430; *People v McKinney,* 24 NY2d 180; *People v Ventimiglia,* 52 NY2d 350; *People v Mleczko,* 298 NY 153.) XI. Victim-impact evidence took center stage in the prosecution's courtroom presentation. (*People v Harris,* 98 NY2d 452; *People v Miller,* 6 NY2d 152; *People v Caruso,* 246 NY 437; *People v Primo,* 96 NY2d 351; *People v Walters,* 251 AD2d 433; *People v Monaco,* 57 NY2d 645; *People v Robinson,* 260 AD2d 508; *People v Rivera,* 74 AD2d 857; *People v Freytes,* 48 AD2d 807; *Chapman v California,* 386 US 18.) XII. The trial court inadequately inquired into the possible tainting of a sworn juror. (*People v Buford,* 69 NY2d 290; *People v Rodriguez,* 71 NY2d 214; *People v Pineda,* 269 AD2d 610, 95 NY2d 802.) XIII. The trial court allowed important testimony in Stephen LaValle's absence and then misled the jury to believe that LaValle chose to be absent. (*Kentucky v Stincer,* 482 US 730; *People v Turaine,* 78 NY2d 871; *People v*

*Epps,* 37 NY2d 343; *People v Morales,* 80 NY2d 450; *Clark v Stinson,* 214 F3d 315; *Johnson v Zerbst,* 304 US 458; *Illinois v Allen,* 397 US 337; *People v Antommarchi,* 80 NY2d 247; *Hopt v People,* 110 US 574; *Comer v Stewart,* 215 F3d 910, 499 US 943.) XIV. The prosecution summations derailed jurors from evaluating the issues rationally. (*Gardner v Florida,* 430 US 349; *People v Moss,* 215 AD2d 594; *People v Paperno,* 54 NY2d 294; *People v Lombardi,* 20 NY2d 266; *People v Robinson,* 123 AD2d 796; *People v Fogarty,* 86 AD2d 617; *People v Grice,* 100 AD2d 419; *People v Harris,* 98 NY2d 452; *People v Miller,* 6 NY2d 152; *People v Caruso,* 246 NY 437.) XV. Given the potential for spillover prejudice from the guilt phase presentation, the court should have empaneled a new sentencing jury. (*People v Lane,* 56 NY2d 1.) XVI. New York State's obligation to ensure reliable capital sentencing overrides defendant's waiver of mitigating evidence. (*Gardner v Florida,* 430 US 349; *People v Harris,* 98 NY2d 452; *Cancemi v People,* 18 NY 128; *People v Allen,* 86 NY2d 599; *United States v Mezzanatto,* 513 US 196; *People v Smith,* 63 NY2d 41; *People v Agron,* 10 NY2d 130; *Sharrow v Dick Corp.,* 86 NY2d 54; *People v Ahmed,* 66 NY2d 307; *People v Kern,* 75 NY2d 638.) XVII. The trial court refused to order a competency examination and hearing, even though defense counsel gave reasons to doubt Stephen LaValle's competency to waive mitigation. (*Drope v Missouri,* 420 US 162; *People v Tortorici,* 92 NY2d 757; *People v Christopher,* 65 NY2d 417; *Godinez v Moran,* 509 US 389; *Dusky v United States,* 362 US 402; *Rees v Peyton,* 384 US 312; *People v Cronin,* 60 NY2d 430; *Martinez v Court of Appeal of Cal.,* 528 US 152; *Faretta v California,* 422 US 806; *Miller ex rel. Jones v Stewart,* 231 F3d 1248.) XVIII. Overlooking Stephen LaValle's faulty understanding of the penalty phase and defense counsel's incomplete mitigation investigation, the trial court allowed LaValle to abandon a penalty phase defense after an inadequate colloquy. (*People v Christopher,* 65 NY2d 417; *Matter of Storar v Dillon,* 52 NY2d 363; *Battenfield v Gibson,* 236 F3d 1215; *Johnson v Zerbst,* 304 US 458; *Colorado v Spring,* 479 US 564; *Godinez v Moran,* 509 US 389; *Von Moltke v Gillies,* 332 US 708; *Wilkins v Bowersox,* 145 F3d 1006; *Patterson v Illinois,* 487 US 285; *People v Mattison,* 67 NY2d 462.) XIX. The trial court should have shared with the sentencing jury documents stating that Stephen LaValle binged on crack-cocaine and beer before the crime, and other documents showing childhood trauma and mental impairment. (*Hitchcock v Dugger,* 481 US 393; *Skipper v South Carolina,* 476 US 1; *Eddings v Oklahoma,* 455 US 104; *Lockett v*

*Ohio,* 438 US 586.) XX. Crippling the adversarial process, the trial court refused to give the defense adequate time to prepare for the penalty phase after lead counsel withdrew from the case. (*Gardner v Florida,* 430 US 349; *People v Rivera,* 71 NY2d 705; *Ungar v Sarafite,* 376 US 575; *People v Spears,* 64 NY2d 698; *People v Foy,* 32 NY2d 473; *People v McLaughlin,* 291 NY 480; *People v Gonzalez,* 43 AD2d 914; *People v Arthur,* 175 Misc 2d 742; *Moore v United States,* 432 F2d 730; *McFarland v Scott,* 512 US 1256.) XXI. The trial court's penalty phase charge prejudicially downplayed the most significant feature of capital sentencing—moral reasoning—and instead directed jurors to consider impermissible factors. (*Penry v Lynaugh,* 492 US 302; *Tuilaepa v California,* 512 US 967; *Romano v Oklahoma,* 512 US 1; *People v Esposito,* 224 NY 370; *Caldwell v Mississippi,* 472 US 320; *Mills v Maryland,* 486 US 367; *Lowenfield v Phelps,* 484 US 231; *Blystone v Pennsylvania,* 494 US 299; *Zant v Stephens,* 462 US 862; *Ford v Strickland,* 696 F2d 804.) XXII. By requiring trial courts to tell jurors that the convicted defendant could be paroled in as little as 20 years, our capital statute exploits jurors' fears to coerce unanimity. (*Lowenfield v Phelps,* 484 US 231; *Morris v Woodford,* 273 F3d 826; *Brown v Texas,* 522 US 940; *Simmons v South Carolina,* 512 US 154; *Mills v Maryland,* 486 US 367; *Penry v Lynaugh,* 492 US 302; *Roberts v Louisiana,* 428 US 325; *People v Pagan,* 45 NY2d 725; *Godfrey v Georgia,* 446 US 420; *Beck v Alabama,* 447 US 625.) XXIII. New York's death penalty is unconstitutional because the death penalty process cannot reliably produce the accurate sentencing results that morality demands. (*Gregg v Georgia,* 428 US 153.) XXIV. The death sentence must be vacated under this Court's holding in *Matter of Hynes v Tomei* (92 NY2d 613 [1998]). (*People v Harris,* 98 NY2d 452; *United States v Jackson,* 390 US 570; *Atkinson v North Carolina,* 403 US 948; *Roseboro v North Carolina,* 403 US 948; *Sanders v North Carolina,* 403 US 948; *Williams v North Carolina,* 403 US 948.)

*Thomas J. Spota, District Attorney,* Riverhead (*Michael J. Miller, Kerry Bassett* and *Anne E. Oh* of counsel), for respondent. I. The New York State death penalty does not violate either the State or Federal Constitution. (*People v Harris,* 98 NY2d 452; *People v Cahill,* 2 NY3d 14; *Gregg v Georgia,* 428 US 153; *Woodson v North Carolina,* 428 US 280; *Murray v Giarratano,* 492 US 1; *Furman v Georgia,* 408 US 238; *Jurek v Texas,* 428 US 262; *Lockett v Ohio,* 438 US 586; *People v Hale,* 173 Misc 2d 140; *People v Broadie,* 37 NY2d 100.) II. This Court's holding in *Matter of Hynes v Tomei* (92 NY2d 613 [1998]) is not

controlling in this case. (*United States v Jackson,* 390 US 570; *People v Harris,* 98 NY2d 452; *People v Hale,* 173 Misc 2d 140; *Gregg v Georgia,* 428 US 153; *Ring v Arizona,* 536 US 584; *Lowenfield v Phelps,* 484 US 231; *Matter of Francois v Dolan,* 95 NY2d 33.) III. Venue was proper in Suffolk County. (*People v DiPiazza,* 24 NY2d 342; *Murphy v Florida,* 421 US 794; *Dobbert v Florida,* 432 US 282; *People v Berry,* 235 AD2d 571; *Irvin v Dowd,* 366 US 717; *People v Boudin,* 90 AD2d 253; *Rideau v Louisiana,* 373 US 723; *People v Acomb,* 94 AD2d 978; *Coleman v Kemp,* 778 F2d 1487; *People v Brockway,* 255 AD2d 988.) IV. Cause challenges to five prospective jurors were properly denied. (*Ross v Oklahoma,* 487 US 81; *Witherspoon v Illinois,* 391 US 510; *People v Harris,* 98 NY2d 452; *People v McQuade,* 110 NY 284; *People v Torpey,* 63 NY2d 361; *People v Johnson,* 94 NY2d 600; *People v Williams,* 63 NY2d 882; *People v Arnold,* 96 NY2d 358; *People v Blyden,* 55 NY2d 73; *People v Baskett,* 250 AD2d 774.) V. Defendant did not establish a prima facie *Batson* violation. (*Batson v Kentucky,* 476 US 79; *People v Bolling,* 79 NY2d 317; *People v Jenkins,* 84 NY2d 1001; *People v Childress,* 81 NY2d 263; *People v Narvaez,* 298 AD2d 603; *People v Morla,* 245 AD2d 468; *People v Brown,* 97 NY2d 500; *People v Truesdale,* 299 AD2d 289; *People v Remelt,* 269 AD2d 815.) VI. There is overwhelming proof of defendant's guilt and any trial or evidentiary error is harmless. (*People v Colavito,* 70 NY2d 996; *People v Bynum,* 70 NY2d 858; *People v Contes,* 60 NY2d 620; *Jackson v Virginia,* 443 US 307; *Chapman v California,* 386 US 18; *People v Crimmins,* 36 NY2d 230.) VII. Neither the Doe nor Roe statements constitute *Brady* material. (*Brady v Maryland,* 373 US 83; *United States v Bagley,* 473 US 667; *United States v Severdija,* 790 F2d 1556; *People v Steadman,* 82 NY2d 1; *People v Baxley,* 84 NY2d 208; *People v Bryce,* 88 NY2d 124; *People v Cotto,* 28 AD2d 1116; *United States v Stewart,* 513 F2d 957; *People v Doshi,* 93 NY2d 499; *United States v LeRoy,* 687 F2d 610.) VIII. The prosecutor's argument that defendant was not animated by the use of drugs or alcohol was not false and did not mislead the jury. (*People v Marks,* 6 NY2d 67; *People v Estrella,* 156 AD2d 710; *People v Halm,* 81 NY2d 819; *People v Morgan,* 66 NY2d 255; *People v Galloway,* 54 NY2d 396; *Brady v Maryland,* 373 US 83; *Napue v People of State of Ill.,* 360 US 264; *Miller v Pate,* 386 US 1; *Paxton v Ward,* 199 F3d 1197; *United States v Valentine,* 820 F2d 565.) IX. The trial court properly exercised its discretion when it declined to charge extreme emotional disturbance. (*People v Roche,* 98 NY2d 70; *People v Casassa,* 49 NY2d 668; *People v Patterson,* 39 NY2d

288, 432 US 197; *People v Harris,* 95 NY2d 316; *People v White,* 79 NY2d 900; *People v Moye,* 66 NY2d 887; *People v Walker,* 64 NY2d 741; *People v Wood,* 79 NY2d 958; *People v Butts,* 72 NY2d 746.) X. The trial court responded meaningfully to the jury notes regarding intent. (*People v Collins,* 99 NY2d 14; *People v Patterson,* 39 NY2d 288; *People v Gray,* 86 NY2d 10; *People v Davis,* 259 AD2d 706; *People v Malloy,* 55 NY2d 296; *People v Almodovar,* 62 NY2d 126; *People v Gonzalez,* 293 NY 259; *People v Steinberg,* 170 AD2d 50, 79 NY2d 673; *People v Cooke,* 292 NY 185.) XI. The trial court properly denied defendant's request to instruct the jury on depraved indifference murder as a lesser included offense of first degree murder. (*People v Green,* 56 NY2d 427; *People v Glover,* 57 NY2d 61; *People v Hafeez,* 100 NY2d 253; *People v Mussenden,* 308 NY 558; *People v Scarborough,* 49 NY2d 364; *People v Crawford,* 295 AD2d 361; *People v Haims,* 171 AD2d 878; *People v Stokes,* 88 NY2d 618; *Hopkins v Reeves,* 524 US 88; *Keeble v United States,* 412 US 205.) XII. Defendant's right to proceed pro se was not abridged, and the trial court properly denied defense counsel's request for a continuance. (*Faretta v California,* 422 US 806; *People v McIntyre,* 36 NY2d 10; *United States v Plattner,* 330 F2d 271; *People v Davis,* 49 NY2d 114; *Williams v Bartlett,* 44 F3d 95; *Wiesner v Abrams,* 726 F Supp 912; *Hacker v Herbert,* 825 F Supp 1143; *Johnson v Zerbst,* 304 US 458; *People v Carter,* 299 AD2d 418; *People v Rainey,* 240 AD2d 682.) XIII. The charges in Indictment No. 1350-97 were properly joined and any unconceded error was harmless. (*People v Lane,* 56 NY2d 1; *People v Van Duser,* 277 AD2d 1034; *People v Lee,* 275 AD2d 995; *People v Molineux,* 168 NY 264; *People v Ventimiglia,* 52 NY2d 350; *People v Robinson,* 68 NY2d 541; *People v Ely,* 68 NY2d 520; *People v Bongarzone,* 116 AD2d 164; *People v Castillo,* 47 NY2d 270; *People v Harris,* 304 AD2d 355.) XIV. There is no merit to the argument that victim-impact evidence was central to the prosecution's case. (*People v Harris,* 98 NY2d 452; *People v Miller,* 6 NY2d 152; *People v Caruso,* 246 NY 437; *People v Scarola,* 71 NY2d 769; *People v Alvino,* 71 NY2d 233; *People v Lewis,* 69 NY2d 321; *People v Jackson,* 173 AD2d 292; *Payne v Tennessee,* 501 US 808.) XV. The trial court properly inquired into a juror's knowledge about a person mentioned during a witness' testimony. (*People v Buford,* 69 NY2d 290; *People v Telehany,* 302 AD2d 927; *People v Whyte,* 282 AD2d 629; *People v Cook,* 275 AD2d 1020; *People v Brace,* 259 AD2d 782; *People v Larrabee,* 201 AD2d 924.) XVI. Defendant knowingly and voluntarily chose to be absent during the Medical Examiner's testimony. (*People v*

*Epps,* 37 NY2d 343; *Johnson v Zerbst,* 304 US 458; *People v Parker,* 57 NY2d 136; *Snyder v Massachusetts,* 291 US 97.) XVII. The prosecutor's summations properly addressed the material issues raised in both the guilt and sentencing phases of trial (*People v Tardbania,* 72 NY2d 852; *People v Nuccie,* 57 NY2d 818; *People v Woods,* 296 AD2d 430; *People v Medina,* 53 NY2d 951; *People v Youngblood,* 261 AD2d 960; *People v Rodriguez,* 135 AD2d 586; *People v Jenkins,* 302 AD2d 978; *People v Bruen,* 136 AD2d 648; *People v Bierenbaum,* 301 AD2d 119; *People v Duvall,* 260 AD2d 183.) XVIII. The trial court was correct when it denied defendant's request to discharge the jury between the guilt and penalty phases of the trial. (*Barclay v Florida,* 463 US 939; *California v Ramos,* 463 US 992; *Darden v Wainwright,* 477 US 168; *People v Harris,* 176 Misc 2d 967; *Lockhart v McCree,* 476 US 162; *Romano v Oklahoma,* 512 US 1.) XIX. The trial court correctly held that defendant could waive the presentation of mitigation evidence. (*People v Finnegan,* 85 NY2d 53; *People v Hedgeman,* 70 NY2d 533; *Gregg v Georgia,* 428 US 153; *United States v Davis,* 285 F3d 378; *Cancemi v People,* 18 NY 128; *People v Brokenshire,* 197 AD2d 921; *People v Ali,* 196 AD2d 544; *People v Barker,* 183 AD2d 835; *People v Bello,* 82 NY2d 862; *People v White,* 73 NY2d 468.) XX. The trial court properly determined that defendant was competent to waive mitigation and neither an examination nor hearing was necessary. (*Drope v Missouri,* 420 US 162; *People v Tortorici,* 92 NY2d 757; *People v Gelikkaya,* 84 NY2d 456; *People v Armlin,* 37 NY2d 167; *People v Morgan,* 87 NY2d 878; *People v Russell,* 74 NY2d 901; *Godinez v Moran,* 509 US 389; *Rees v Peyton,* 384 US 312; *Dusky v United States,* 362 US 402; *People v Francabandera,* 33 NY2d 429.) XXI. The trial court correctly found that defendant knowingly, voluntarily and intelligently waived his right to present mitigation evidence. (*Faretta v California,* 422 US 806; *Von Moltke v Gillies,* 332 US 708; *Battenfield v Gibson,* 236 F3d 1215; *Chandler v Greene,* 145 F3d 1323; *Coleman v Mitchell,* 268 F3d 417; *Wilkins v Bowersox,* 145 F3d 1006.) XXII. There is no mechanism for the trial court to share information with the jury. XXIII. The penalty phase jury charge was correct. (*People v Whalen,* 59 NY2d 273; *People v Fields,* 87 NY2d 821; *People v Slacks,* 90 NY2d 850; *People v Coleman,* 70 NY2d 817; *Jones v United States,* 527 US 373; *Bryan v United States,* 524 US 184; *California v Brown,* 479 US 538; *United States v Park,* 421 US 658; *Cupp v Naughten,* 414 US 141; *Boyd v United States,* 271 US 104.) XXIV. The deadlock instruction of section 400.27 (10) of the Criminal Procedure Law is valid under both federal and

state law. (*People v Harris,* 98 NY2d 452; *People v Acevedo,* 69 NY2d 478; *People v Owens,* 214 AD2d 480; *People v Berg,* 59 NY2d 294; *People v McIntosh,* 178 Misc 2d 427; *Mills v Maryland,* 486 US 367; *Lockett v Ohio,* 438 US 586; *Simmons v South Carolina,* 512 US 154; *Romano v Oklahoma,* 512 US 1; *Buchanan v Angelone,* 522 US 269.)

*Eliot Spitzer, Attorney General,* New York City (*Luke Martland, Peter B. Pope, Daniel Smirlock* and *Robin A. Forshaw* of counsel), in his statutory capacity under Executive Law § 71. I. A defendant, who, under the Federal and State Constitutions has a right to determine his own destiny, may waive the presentation of evidence in mitigation, and there is no "independent sovereign interest" that requires that such evidence be presented over defendant's wishes. (*People v McIntyre,* 36 NY2d 10; *People v Arroyo,* 98 NY2d 101; *Faretta v California,* 422 US 806; *People v Colon,* 90 NY2d 824; *Jones v Barnes,* 463 US 745; *People v Smith,* 68 NY2d 737, 479 US 953; *McKaskle v Wiggins,* 465 US 168; *People v Petrovich,* 87 NY2d 961; *People v Harris,* 98 NY2d 452; *Furman v Georgia,* 408 US 238.) II. CPL 400.27 (10) is constitutional and ensures that jurors are correctly informed of what will occur in the event of deadlock, thereby minimizing juror speculation and arbitrariness. (*Gregg v Georgia,* 428 US 153; *Furman v Georgia,* 408 US 238; *Lockett v Ohio,* 438 US 586; *Woodson v North Carolina,* 428 US 280; *Beck v Alabama,* 447 US 625; *Gardner v Florida,* 430 US 349; *Jurek v Texas,* 428 US 262; *California v Ramos,* 463 US 992; *Ramdass v Angelone,* 530 US 156; *Simmons v South Carolina,* 512 US 154.) III. New York's death penalty statute is constitutional and defendant's speculative claims that it might be applied in an arbitrary manner, or that innocent people might be executed, are baseless. (*Gregg v Georgia,* 428 US 153; *People v P.J. Video,* 68 NY2d 296; *People v Scott,* 79 NY2d 474; *People v Broadie,* 37 NY2d 100, 423 US 950; *People ex rel. Kemmler v Durston,* 119 NY 569, 136 US 436; *Furman v Georgia,* 408 US 238; *People v Fitzpatrick,* 32 NY2d 499, 414 US 1033; *People v Davis,* 43 NY2d 17, 435 US 998; *People v Smith,* 63 NY2d 41, 469 US 1227; *Herrera v Collins,* 506 US 390.) IV. Defendant's Fifth and Sixth Amendment rights were not impermissibly burdened by the first degree murder guilty plea provisions, because those provisions were stricken as unconstitutional prior to the start of defendant's trial. (*Matter of Hynes v Tomei,* 92 NY2d 613, 527 US 1015; *People v Harris,* 98 NY2d 452; *United States v Jackson,* 390 US 570; *Matter of Francois v Dolan,* 95 NY2d 33; *Boykin v Alabama,* 395 US 238; *Parker v North Carolina,* 397 US 790; *Atkin-*

son v North Carolina, 403 US 948; Furman v Georgia, 408 US 238; Corbitt v New Jersey, 439 US 212.)

**OPINION OF THE COURT**

G.B. SMITH, J.

A Suffolk County jury found defendant Stephen S. LaValle guilty of first degree murder in the course of and in furtherance of first degree rape (Penal Law § 125.27 [1] [a] [vii]) and sentenced him to death. His direct appeal comes to us from Supreme Court pursuant to our unique jurisdiction in death penalty cases (NY Const, art VI, § 3 [b]; CPL 450.70 [1]). For the reasons that follow, we uphold the conviction, but vacate the death sentence, and remit for resentencing in accordance with CPL 470.30 (5) (c). In vacating the death sentence, we conclude that the jury deadlock instruction prescribed in CPL 400.27 (10) is unconstitutional under article I, § 6 of the State Constitution. We further conclude that this defect in the existing statute can only be cured by a new deadlock instruction from the Legislature.

## I. FACTS

Around 12:30 P.M. on Saturday, May 31, 1997, the body of Cynthia Quinn was found in the woods near Mills Road in Yaphank, a village in Suffolk County. Her neck, chest, back and arms were covered with 73 puncture wounds made with a screwdriver-like instrument. She had been raped. She also had a broken rib, bruises on her arms and abrasions on many parts of her body.

About six hours earlier, she had left her home for her customary morning jog. Several Yaphank residents saw her running along her route. By 7:30 A.M., her husband Brian Quinn grew concerned that she had not returned home and began searching for her. He had expected her to return by 7:00 A.M. because, as a self-employed carpenter, he was scheduled to report to a work site at 7:30 A.M. He also knew that Cynthia, a high school track coach, had a track meet that same morning. Initially, Brian searched the surrounding area in his car, with his two young children, and then enlisted the help of fellow volunteer firefighters. Eventually, several units of the police department joined the search. The body was discovered by two volunteer firefighters.

Earlier that same morning, Monique Sturm was attacked and robbed by a man who bumped her car on a road in Port Jeffer-

son, which is about eight miles from where the body was found. She managed to escape through the passenger door when the man forced himself through the door on the driver's side. In the process, she bit his finger. In her call to 911, placed at 5:57 A.M., Sturm provided a description of the assailant and his car. Sturm's wallet was found around 11:40 A.M., not far from the murder scene.

Police investigators connected the two events, inferring that the same person was behind both. According to pretrial testimony, several weeks earlier a pedestrian was accosted by the driver of a car similar to that of defendant. Defendant was a suspect in that incident, and Sturm's description of the assailant and his car matched the description that woman gave. The police learned that in 1986 defendant was convicted of sexually assaulting a female driver he had bumped with his car and that he was on parole as the result of a burglary conviction. The police also learned that defendant's car was similar to a car seen near the crime scene about 6:30 A.M. that Saturday. That witness identified defendant's car as the car he had seen. Sturm, however, could not identify defendant's car as the one her assailant had been driving and could not definitively identify defendant in a photo array.

Two days after the murder, on June 2, 1997, the police arrested defendant in connection with the robbery after he was told to report to his parole officer. Defendant's right index finger had a cut. Defendant waived his *Miranda* rights and was interrogated. According to the trial testimony of the interrogating officer, defendant initially denied any involvement with Sturm. Eventually, he admitted that his car hit Sturm's car. Defendant told the police that the night prior to the encounter, he and his family had gone to dinner around 7:30 P.M. at a local restaurant. After dinner, he went to a comedy club, arriving at around 8:30 P.M. An hour later, he went to a pub named Harrigan's, where he stayed for a few hours with his friend Phil Anderson and a man named Brett. After dropping off Phil at his home, defendant told the police, he and Brett went to a keg party, where they stayed for a few hours. At around 5:45 A.M., he dropped off a man named Tom near a 7-Eleven store. As defendant drove off, he turned a corner and he hit a car. When he pulled over, a female got out of the other car and began yelling at him and attacked him with her pocketbook. He took the pocketbook from her, and threw it over a fence. Defendant claimed that he tried to calm her down by pushing her into the

car, but that she hit him and kicked him. Defendant admitted to the police that he got inside her car, and she jumped out the passenger door and ran to a nearby house yelling for help. Defendant said he returned to his car and drove away. Defendant prepared a sketch of where the incident took place and gave the police permission to search his car and take samples of his hair, blood and saliva.

Defendant eventually confessed to the murder of Cynthia Quinn. He stated that while driving home, he had stopped on the road to urinate. A woman jogging on the road began yelling that he was a bum and should use a restroom. He became angry because people had been yelling at him his whole life, and walked toward her. Defendant told the police that the woman backed into the woods and began waving a long thin piece of metal, like a screwdriver, at him. Defendant could see that she was scared. Defendant grabbed the piece of metal away from her and started stabbing her. When she fell down, he raped her. Then, he started stabbing her again. According to defendant, he later sat down on a nearby log and cried. Defendant told the police that he ran back to his car and drove toward his house, discarding the weapon along the way. When he got home, he threw his clothes into a hamper. Defendant drew sketches of the murder scene and the weapon for the police.

On June 5, 1997, a grand jury indicted defendant for murder in the first degree (Penal Law § 125.27 [1] [a] [vii]—intentional murder in the course of committing or attempting to commit and in furtherance of rape in the first degree, or in the course of and furtherance of immediate flight after committing or attempting to commit rape in the first degree); three counts of murder in the second degree (Penal Law § 125.25 [1], [2], [3]—intentional murder, depraved indifference murder and felony murder),[1] and robbery in the first degree (Penal Law § 160.15 [2]). He was arraigned on June 9, 1997. On August 12, 1997, the People served notice of intent to seek the death penalty (CPL 250.40).

Opening statements commenced on June 8, 1999, and the trial lasted 17 days. The jury considered 41 prosecution witnesses and 180 exhibits, including evidence showing that defendant's DNA matched samples collected from the victim's

---

**1.** On motion of the prosecution, the trial court dismissed the depraved indifference murder and second degree felony murder counts (counts three and four respectively) prior to trial.

body and clothing. Defendant did not present any witnesses. Two days after summations, the jury found defendant guilty of first degree murder and one count of second degree murder (intentional murder) and found him not guilty of the robbery charge. After the jury's verdict, the trial court, pursuant to CPL 300.30 (4) and 300.40 (3) (b), dismissed the guilty verdict for murder in the second degree in light of the first degree murder verdict. The penalty phase began on August 3, 1999 and concluded on August 6 when the jury rendered a verdict that defendant be sentenced to death.

Throughout the proceedings below, defendant filed a flurry of motions, most of which the courts denied, and objected to numerous rulings. On appeal, defendant raises a number of issues. We conclude that defendant's guilt was established beyond a reasonable doubt, and that the verdict of guilt was not against the weight of the evidence. We consider first issues arising during the guilt phase and then turn to the penalty phase. We do so with the awareness both that death is different and that CPL 470.30 confers upon this Court unique powers of review (*see People v Harris*, 98 NY2d 452, 474 [2002]).

## II. GUILT PHASE
### A. JURY SELECTION

■ Defendant argues that the trial court erred in failing to grant challenges for cause against jurors Nos. 16, 43, 79, 107 and 124, because they were not impartial and held views that substantially impaired their ability to consider a life sentence. None of these jurors sat on the case. The defense exhausted its peremptory strikes, and defendant argues for relief pursuant to CPL 270.20 (2), which states

> "An erroneous ruling by the court denying a challenge for cause by the defendant does not constitute reversible error unless the defendant has exhausted his peremptory challenges at the time or, if he has not, he peremptorily challenges such prospective juror and his peremptory challenges are exhausted before the selection of the jury is complete."

We disagree with defendant that the trial court erroneously failed to grant the challenges for cause.[2]

Under CPL 270.20 (1) (b), a prospective juror who "has a state of mind that is likely to preclude him from rendering an

---

2. We discuss only defendant's objection to juror No. 16 but conclude that his objections to the other jurors are also without merit. We also reject

impartial verdict based upon the evidence adduced at the trial" must be excused for cause. "[A] prospective juror whose statements raise a serious doubt regarding the ability to be impartial must be excused unless the juror states unequivocally on the record that he or she can be fair and impartial" (*People v Chambers*, 97 NY2d 417, 419 [2002]).

Additionally, in a capital case, a prospective juror must also be excused for cause if he or she "entertains such conscientious opinions either against or in favor of such punishment as to preclude such juror from rendering an impartial verdict or from properly exercising the discretion conferred upon such juror by law in the determination of a sentence" (CPL 270.20 [1] [f]). As this Court held in *People v Harris*, "Where jurors express conscientious views concerning the death penalty yet still make clear that they are able to follow their oaths to act impartially, they cannot be excluded for cause from participating on the jury" (98 NY2d 452, 484 [2002]; *see also People v Cahill*, 2 NY3d 14, 47 [2003]).

Defendant argues that juror No. 16 should have been excused because he had already decided defendant was guilty, he was sympathetic and felt a common bond with the victim, he believed that police officers are more credible than other witnesses, and he was biased in favor of the death penalty in first degree murder cases. In moving to dismiss juror No. 16 at trial, defense counsel argued only that juror No. 16's answers during voir dire were totally different from those on his written questionnaire and that he had a preconceived notion about the case and felt sympathy for the victim.

During voir dire, juror No. 16 expressed doubts about his initial impression, and recognized that "the system is supposed to be fair, everyone gets a fair trial, and I believe in that." When questioned about his views about confessions, he again stated

---

defendant's arguments that the trial court failed to respond meaningfully to a juror note on intent, and inadequately inquired into the possible tainting of a sworn juror; that the trial court allowed important testimony in defendant's absence and then misled the jury to believe that defendant chose to be absent; that the trial court should have empaneled a new sentencing jury after the guilt phase; that defendant established a prima facie showing of discrimination against female jurors under *Batson v Kentucky* (476 US 79 [1986]); that venue should have been changed (*see People v Cahill*, 2 NY3d 14, 38 [2003]); that the trial court erroneously permitted joinder of the robbery count; and that the trial court should have allowed the jury to consider murder in the second degree (depraved indifference murder) as a lesser included offense of murder in the first degree, and to consider a jury charge of extreme emotional disturbance.

that while he initially thought defendant was guilty, he since realized that "we have to come into the courtroom with a blank slate and listen to evidence from both sides and make a decision." Time after time, when asked to respond to answers from his questionnaire, juror No. 16 gave answers evidencing impartiality, such as, "We have to come into the courtroom and see what the facts are and make a decision based on that," and "I try to be fair . . . I don't always end up by being fair, but I do try to be fair . . . If I'm selected, I will do the very best job I can." Defendant's argument that juror No. 16 would find police officers more credible than other witnesses is unpreserved. In any event, juror No. 16 unequivocally indicated that he would follow the court's instruction not to give police testimony more weight than that of other witnesses. Juror No. 16, like the deceased, was a runner. He stated that it would not affect him, and that he would base his decision on the evidence presented at trial. Additionally, this juror assured the trial court of his ability to be impartial (*see People v Johnson*, 94 NY2d 600, 613-614 [2000]).

On the subject of the death penalty, juror No. 16 indicated that he would consider whatever mitigation was required by law and that he had no preconceived notion of how defendant should be punished. He therefore did not hold a conscientious belief that would prevent or substantially impair his ability to exercise discretion during the penalty phase (*see Harris*, 98 NY2d at 484).

B. THE SELF-REPRESENTATION CLAIM

On the same day that jury selection began, February 16, 1999, defendant requested new attorneys, complaining that he was dissatisfied with his current counsel. He complained that his two lawyers "spend no time with each other" or with him, and "want to attack this case in two different ways." Defendant said that he wished to "get this over and get this going as quick as" possible, but that "there's so many things left undone." His lead attorney, Robert Gottlieb, characterized the attorney-client relationship as broken. The court denied the application, urging defendant to cooperate with his lawyers. Defendant again complained that he wished to "be able to go over my case with my lawyers and have questions answered, and there's so many things unanswered."

On May 18, 1999, at defendant's request, defendant and his attorneys met ex parte with the court. The source of the conflict

was crystallized. Gottlieb pointed to a severe disagreement over trial strategy. Counsel's strategy involved making certain "concessions [with respect to culpability] that would lead to credibility all down the line." Defendant, counsel complained, was uncooperative, even ordering his family not to cooperate with a private investigator. Defendant stated that problems over strategy arose once the prosecutor offered life without parole if defendant pleaded guilty. His lawyers and his family were urging him to accept the plea. Defendant explained that his strategy centered on denying any involvement with the murder and rape of Cynthia Quinn. As counsel put it, defendant wished to "fight everything tooth and nail to the end until it's determined."

After some discussion with the court in which defendant expressed his dissatisfaction with his lawyers as well as ambivalence as to whether he wished new lawyers or wanted the court to instruct his lawyers to abide by his strategy, defendant stated, "Your Honor, if you are telling me that I have to respect and listen to my lawyers['] views on how to attack this case, I would have to disagree with you. I would ask that you would dismiss my lawyers and if I could represent myself." The court responded, "That to me would be absolutely insane."

Defendant remained steadfast in his view that he could not follow any strategy other than one that proclaimed his innocence, adding, "The only thing I see and that's my last option is to represent myself, not that I want to, I don't know [anything] about the law, but at least I have a chance to prove my innocence." The court again responded, "[I]f you are asking me to dismiss your lawyers, I can't do that in good conscience. If you are asking me to allow you to represent yourself pro se at this point, I can't do that in good conscience because it would be absolutely disastrous." The court continued, "If I allowed you to represent yourself, everything I said [about protecting your rights] would be out the window . . . I just want you to think about that." Defendant responded that if the court was going "to deny me [the right] to represent myself, maybe take into consideration appointing two new lawyers." The court stated that it could not do that either. Explaining at length why self-representation would be a disaster, the court urged him "to think about what you have said." The court concluded the discussion with the statement, "Let the record reflect, he does have a smile on his face."

On May 24, 1999, a week before trial, Gottlieb moved to withdraw because there was "a total breakdown" in his rela-

tionship with defendant. Gottlieb made clear that he could not follow defendant's trial strategy. Associate counsel, Martin Efman, stated that he was willing to try the case as defendant wished, and defendant confirmed that he could proceed with Efman. The court granted Gottlieb's withdrawal motion, elevated Efman to lead counsel, and approved Charles Von Schmidt as associate counsel.

While the right to counsel has emerged as a cherished and valued right, it has not displaced the constitutional right of self-representation. The request to represent oneself must be invoked clearly and unequivocally (*Faretta v California*, 422 US 806 [1975]; *People v Davis*, 49 NY2d 114 [1979]). We have held that to ensure convicted defendants not "pervert the system by subsequently claiming a denial of their *pro se* right, the *pro se* request must be clearly and unconditionally presented to the trial court" (*People v McIntyre*, 36 NY2d 10, 17 [1974]). Before allowing a defendant to proceed pro se, the court must conduct a searching inquiry to ensure that the waiver of the right to appointed counsel is "unequivocal, voluntary and intelligent" (*People v Smith*, 92 NY2d 516, 520 [1998]). Denial of the right of self-representation is not subject to harmless error analysis (*McKaskle v Wiggins*, 465 US 168, 177 n 8 [1984]).

We conclude that defendant's request to represent himself was not clearly and unequivocally presented and, therefore, the court did not err in acting as it did. Defendant gave the impression that he was not committed to self-representation. Rather, he was understandably hesitant considering the daunting task of undertaking self-representation in a capital case. After all, even lawyers who defend capital cases must receive special training. Initially, defendant made the conditional statement that if the court forced him to go along with the strategy of his attorneys, he would ask to represent himself. Defendant did not assertively state that he wanted to represent himself. Defendant then stated that he saw self-representation as his last option, though he did not want to represent himself because he did not know anything about the law. When defendant mentioned self-representation for the last time, he again couched it as a hypothetical, adding the request for new lawyers as an alternative. The court urged defendant to think about the perils of self-representation and did not make a definitive ruling. Defendant's statements do not reflect a definitive commitment to self-representation.

In contrast to this case, in *Williams v Bartlett*, a case that defendant relies upon, the defendant asserted, "I will represent

myself" (44 F3d 95, 97 [1994]) after being warned of the dangers of self-representation. The defendant had represented himself before the grand jury. On another occasion, defendant stated, "it's . . . my intention[ ] now to go pro se. Before I wanted to have an attorney, but I can't afford a private attorney. That's why I'm going pro se" (*id.* at 98). The United States Court of Appeals for the Second Circuit found that on each occasion, defendant's "statements show a 'purposeful choice reflecting an unequivocal intent to forego the assistance of counsel' " (*id.* at 100, quoting *United States v Tompkins*, 623 F2d 824, 827-828 [2d Cir 1980]). In this case, defendant wavered, and when warned at length about the perils of self-representation, and asked to think about his request, he smiled and said nothing more.

While conditioning a request for new attorneys with a request for self-representation does not necessarily make the latter request equivocal, it is clear that in this case defendant raised the specter of self-representation as a means of procuring the dismissal of Gottlieb. Defendant and Gottlieb were intractably at odds over strategy. Defendant had sought to have Gottlieb removed on two occasions prior to the May 18th meeting. When Gottlieb announced in a meeting with the court and the other attorneys on May 24th that he wished to be relieved, the court later asked defendant for his view, and he stated, "I'm ready to proceed . . . with . . . Martin Efman. Me and Mr. Gottlieb cannot get along . . . Our whole trial strategies are different . . . Me and Mr. Efman are willing to go to trial the way I would like to go to trial." The court later relieved Gottlieb. After the dismissal, defendant never said a word about wanting to represent himself. The issue of self-representation was closed, with defendant satisfied with Gottlieb's dismissal, the elevation of Efman to lead counsel and the appointment of a new associate counsel.

## C. WITHHOLDING OF EVIDENCE—*BRADY* MATERIAL

More than two months after the commencement of jury selection and more than two years after the murder, on April 29, 1999, the police obtained a written statement from John Doe,[3] a friend of defendant. Doe stated that "[a]bout two years ago," defendant had asked him to "hang out." They went to another house, belonging to Richard and Maria, where the three men "partied and drank beers" in the basement. Doe and defendant

---

**3.** John Doe and Richard Roe are fictitious names. Neither Doe nor Roe testified at trial.

then drove to a bar, although neither drank there. They then drove around, and "had a couple of more beers." Because he was tired, Doe called it a night. When defendant drove Doe home, it was still dark. Several days later, Doe heard that defendant had been arrested.

Richard Roe provided two statements. In the first, dated May 5, 1999, he stated that he met defendant during the Memorial Day weekend (May 24-26) of 1997. A couple of days later, on a Friday, he, defendant and John Doe went into the basement of his house where they "partied" for a few hours. Defendant drank two beers and seemed "docile." According to Roe, defendant and Doe stayed for a few hours and then left.

The second statement, dated May 19, 1999, differed significantly from the first. Roe maintained that Doe and defendant arrived at Roe's house around 9:30 or 10:30 P.M. Defendant had two beers, and they all smoked crack. They then left the house to purchase more crack from a drug dealer. The dealer wanted defendant "to fuck someone up and LaValle said he'd do it." Roe allegedly told Doe to "get LaValle back, to leave." Roe claimed he "was afraid what might happen." According to this version, the three went back to the basement, and continued to smoke crack until about 1:30 to 2:00 A.M. when Roe told defendant and Doe that they had to go. Roe also claimed that he became nervous when defendant told him that his then-15-year-old daughter was pretty, and that guys would pursue her. The next day, a friend told Roe that defendant was a "dirt bag." A couple of days later, he learned about the murder.

On June 2, 1999, about a week before trial, the prosecutor informed the defense that the police had obtained statements from a few witnesses who might have been with defendant the night before the murder. On July 1, defense counsel requested copies of the statements. Counsel referred in particular to the Doe statement, which he believed might have contained information beneficial to defendant. The court told the People to submit any statements falling under *Brady v Maryland* (373 US 83 [1963]) for in camera review. The prosecutor consented, adding that he had provided the defense with "a general outline" of the Doe statement. Defense counsel expressed the concern that "the People were trying to hold [any statements] for rebuttal if we called [the witnesses] in the first instance" and that it was "important now for us to see what's in there or for the court, at least, to make a determination." Defense counsel added that the defense had attempted to interview Doe, but that he

was "not very giving of information" and that "the most telling information might be in the statement he gave to the police." In his written submission, defense counsel argued that despite reasonable diligence, the defense could not ascertain the contents of the statement.

In a written opinion, the court ruled that the statements were not *Brady* material since defendant knew of the contents of the statements and also knew that Roe and Doe had provided the statements. The court also ruled that during the penalty phase, the prosecutor would satisfy his *Brady* obligation by providing defendant with the identity of witnesses who may be a source of relevant mitigation evidence.[4] After the close of evidence in the guilt phase, but before summations, defense counsel again requested the statements, arguing Roe and Doe were not forthcoming "about certain areas which might incriminate them." Defense counsel raised the issue again after summation, arguing that the statements might be relevant as a mitigator, but the court adhered to its prior ruling.

On July 30, defense counsel renewed his motion for the disclosure of the Doe and Roe statements for use in the penalty phase. In his attached affirmation, counsel stated that prior to trial, the prosecutor had informed the defense of the existence of written statements by two witnesses. Counsel believed that the statements contained information that "defendant, together with these individuals, was under the influence of alcohol and narcotics for many hours immediately preceding the incident which is the subject of the indictment and First Degree Murder conviction." This information was relevant to the circumstances of the case and as a mitigator.[5] Counsel argued that the statements were admissible at the penalty phase as reliable hearsay and statements made against penal interest. In the other affirmation, defense counsel Charles Von Schmidt detailed his unsuccessful personal efforts to speak with Doe.

In *Strickler v Greene*, the Supreme Court summarized the "essential components of a *Brady* violation" (527 US 263, 280

---

4. Defense renewed the request on July 14 and July 30 and the court denied both requests.

5. Because of our conclusion on the deadlock issue, we need not address defendant's argument that the trial court wrongfully permitted him to forego mitigation evidence, the prosecution's arguments that the Legislature permitted but did not require a defendant to submit such evidence and what, if any, constitutional problems might arise where the jury heard no mitigation evidence, even if an independent source, such as a probation department, could provide it.

[1999]) as follows: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued" (*id.* at 281-282). *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" (373 US at 87).

■ We do not doubt that the statements contained some measure of favorable evidence.[6] We conclude, however, that they were not suppressed by the prosecution and that, accordingly, there was no *Brady* violation in this case. Evidence is not suppressed where the defendant "knew of, or should reasonably have known of, the evidence and its exculpatory nature" (*People v Doshi*, 93 NY2d 499, 506 [1999]). Defendant knew or should have known that he drank alcohol and took drugs with Roe and Doe. Moreover, defense counsel, in an affirmation seeking the statements, admitted that the defense believed that the statements dealt with use of alcohol and drugs the night before the murder. The defense knew the identities and addresses of Roe and Doe. Possession of the statements would not have revealed any essential information that the defense did not already know (*see Allen v Lee*, 366 F3d 319, 325 [4th Cir 2004] [where defendant argued that the government withheld jail records indicating that he received antiwithdrawal medication, no *Brady* claim arose since defendant "had personal knowledge of any medication he might have received"]). Finally, we note that the prosecution submitted the statements to the court which decided that the prosecution had satisfied its *Brady* obligation.

Defendant argues that this case is indistinguishable from *Leka v Portuondo* (257 F3d 89 [2d Cir 2001]), where the Second Circuit determined that the government violated its *Brady* obligation. We disagree. *Leka* was a murder case in which the prosecutor's evidence consisted of the testimony of a number of eyewitnesses. Early in the case, the prosecutor informed the defense that one of the witnesses was a police officer who would identify the defendant. Three business days before the trial, however, the prosecutor told defense counsel that the officer would not identify the defendant, but did not say anything about

---

**6.** The statements, which had been sealed as a court exhibit, were unsealed on appeal.

what the officer saw. Because the defense used a ruse to try to contact the officer, the court granted the prosecutor's request to foreclose access to the officer.

The Second Circuit held that the witness's favorable testimony was suppressed, finding that "the prosecutor never made specific disclosure of what [the witness] had seen. There is no doubt that the prosecutor had that information from the beginning of the case" (257 F3d at 100). The court rejected the government's argument that disclosure of the witness's name, and (presumably) the address, satisfied its *Brady* obligation, noting that the disclosure was "too little, too late" (*id.*). The court reasoned that "[t]he limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation" (*id.* at 101). The court also noted that the defense used the ruse because the government failed to be forthcoming about what the officer knew. In addition, it was too much to expect defense counsel to seek an order vacating or modifying the court's order precluding contact with the officer on the eve of trial when counsel did not know whether the witness would provide useful information.

There are significant differences between *Leka* and this case. The defense in *Leka* knew nothing about what the witness knew. Here, the defense knew the essential information contained in the statements. The disclosure here was not too little, nor was it too late. The defense had a week prior to the start of the trial in which to subpoena Roe and Doe.

Defendant also relies on *Boss v Pierce* (263 F3d 734 [7th Cir 2001]). In *Boss*, the state relied on the testimony of one eyewitness to establish that two brothers, along with others, killed and robbed the victim. Defendants called four witnesses, one of whom was his girlfriend who provided an alibi. The girlfriend's sister partially corroborated her testimony. On the last day of the two-day trial, the state gave defendants an investigative report containing information unknown to defense counsel (*id.* at 737-738), namely that the sister told investigators that the government's witness had implicated himself in the killing and robbery, and only implicated the brothers to get them in trouble. The United States Court of Appeals for the Seventh Circuit rejected the state's argument that since the sister was defendants' witness, the defense had access to any information she possessed. The court held that defendants had no reason to suspect that the sister would know the information in the

report. Again, in this case, the defense knew the essential information contained in the report.

Another case defendant relies on, *United States v Severdija* (790 F2d 1556 [11th Cir 1986]), in which the United States Court of Appeals for the Eleventh Circuit found a *Brady* violation, is closer to this case. There, the captain of a ship was convicted of conspiracy to possess with intent to distribute marijuana found on his ship. Days before his arrest, the defendant told a member of the Coast Guard who boarded his ship that he had been hired to pick up a tow, that he did not know his crew very well and that he did not trust them. Defendant also suggested that the Coast Guard remain in the area because the boat would be carrying drugs. The member of the Coast Guard recorded defendant's statements. At the trial, defendant testified that he informed the Coast Guard about the marijuana, which had been placed on his boat over his objection.

While acknowledging that the defendant must have been aware of the statement he made, the court found that the evidence at issue was the recordation of the statement, not the statement itself. The statement could have corroborated defendant's defense. The court noted that had defendant testified about the statement, without corroborating evidence, jurors would likely have perceived it as a self-serving statement. It is significant, however, that the court reached this result after finding that "neither the identity of the [Coast Guard officer who recorded the statement] nor the contents of his report was disclosed to the defense until after the jury had returned its verdict" (*id.* at 1559). That was not the case here. Moreover, in this case, defendant did not present any testimony during the guilt phase that the statements would have corroborated. Indeed, defendant claimed he was not the person who committed the crime. The second Roe statement would have further tarnished defendant before the jury, by portraying defendant as a crack cocaine user, a voyeur of Roe's young daughter, a "dirt bag," and a person willing to assault another at the behest of a drug dealer.

## D. "VICTIM-IMPACT" EVIDENCE

During the guilt phase the prosecutor opened with the statement that on the day of the murder, "Suffolk County became a lesser place. . . . On that day, we, as a community, lost Cindy Quinn to a brutal act of random predatory violence as she jogged near her home in Yaphank. Cindy was someone we all know, a

mother, a wife, a daughter, a sister, a friend, a teacher, a coach."
The prosecutor would urge the jury "to show [defendant] the
same compassion he showed to [the mother of two young chil-
dren]."

On June 14, defendant moved to preclude testimony of Brian
Quinn, Cynthia's husband, arguing that the testimony would
inflame the jurors. Defense counsel offered to "stipulate to
everything, her death and body being in that location." The
prosecution refused. The trial court allowed the testimony based
on a timeline test, demarcating events prior to the murder as
permissible, and those after as impermissible.

Quinn testified that he was a self-employed carpenter and
that he built the family home with his own hands. On the day
of the murder, he was awakened by the cries of his two-year-old
son. Quinn identified a ruby earring his wife was wearing when
she was found. He also provided other personal information
regarding his wife—that she was a high school teacher with a
Master's degree, she coached the school's track team, she had
two living sisters, her parents were alive, and he and the
deceased also had a four-year-old daughter. Every morning she
would wake up near dawn to jog and would sometimes run with
the children in a jogging stroller.

The defense objected to much of the testimony, characterizing
it as victim-impact evidence. Defendant argues here that much
of Quinn's testimony constitutes an improper victim-impact
statement through which the prosecutor advanced the theme of
lost promise.

While it is only natural for jurors to react with horror at the
brutality of a violent murder, jurors have an obligation to decide
the issues in the case "in a judicial temper. Appeals to sympathy
or prejudice can but be harmful" (*People v Caruso*, 246 NY 437,
443 [1927]). In *Caruso*, the prosecution, over objection, called
the widow of the deceased who testified that they had been
married for 18 months, had a six-month-old child, and that the
deceased would sit on the baby's crib and sing to her. The
widow's testimony, we concluded, constituted reversible error
because it "had no materiality upon the issues before the jury"
and was an " 'unseemly and unsafe' appeal to prejudice" (*id.* at
444). In *People v Miller* (6 NY2d 152 [1959]), the prosecutor
elicited from the deceased's brother that the deceased had a
wife and seven children. We again found, "There could be no
purpose to this line of testimony but to conjure up in the minds

of the jurors undue prejudice against the defendant" (*id.* at 157).

In *People v Harris*, where the type of testimony of victims' families was "indistinguishable from that in *Miller* and *Caruso*," we stated, "Although family information about a victim is an important aspect of the victim's life, generally, it has no bearing on defendant's guilt or innocence" (98 NY2d at 491). There we found that, to the extent the claims were preserved, the error was harmless in light of the overwhelming evidence of guilt.

■ Here, unlike *Caruso* and *Miller*, much of the testimony was material because it explained the sequence of events, from the husband's discovery that his wife was missing to learning that his wife's body had been found later in the day.[7] To be sure, there was testimony that was irrelevant to the sequence of events, such as that Cynthia had a Master's degree, but such testimony was minimal and harmless where the proof was overwhelming and there was no significant probability that, but for this error, the jury would have acquitted defendant (*see People v Crimmins*, 36 NY2d 230, 237 [1975]).

E. GUILT PHASE SUMMATION

Defense counsel's summation reflected somewhat the initial conflict that permeated defendant's relationship with his lawyers. Counsel argued that defendant was not the person who committed the murder. Alternatively, he argued that the person who did it had demons inside, and suddenly snapped at the slightest provocation. Counsel maintained that the circumstances surrounding the killing evinced lack of control. He also urged that "there's some greater system in the world that determines when and how we die," in an effort to shift blame away from defendant.

The prosecutor began by noting that "mere words are very inadequate to convey the horror of what occurred to Cindy Quinn that morning two years ago." He added symbolically, "I know you have visited those woods on that Saturday attempting to see and feel what atrocity went on. I remind you now what the testimony of Lynn Weyant . . . My God. What sort of scream came from those woods to prompt that type of reaction? What sort of torture caused that scream? Now you know. You've seen it. You've seen what he did to Cindy Quinn."

---

7. For much the same reason we also conclude that the testimony of firefighters and police officers involved in the search was material.

The prosecutor referred to Sturm as "quivering and shuddering" on the witness stand as she confronted her attacker, and contrasted her good fortune to the brutal death of Cynthia Quinn. Sturm "was lucky enough to go on with her life and now she has a beautiful little baby boy." Cynthia's two children, on the other hand, "have no mommy," Brian has no wife, and her family has lost a daughter and a sister. The prosecutor told the jurors, "We can only pray that Cindy thought to take the time to pat them on the head or kiss them before she went out that morning."

In conclusion, the prosecutor told the jurors that for 17 days they had "sat in the presence of evil." And unlike defendant, Cynthia Quinn was buried 25 months earlier without the opportunity to present a defense. The prosecutor asked the jurors to look defendant in the eye and tell him, "[Y]ou're a murderer, you're a rapist, and you're guilty, and you shall be held responsible."

After the prosecutor's summation, defense counsel moved for a mistrial, arguing that the prosecutor sought to inflame the jury. The court denied the motion.

On appeal, defendant argues that the prosecutor committed a number of improprieties during the guilt phase summation: inviting jurors to relive the victim's suffering by expressing that words could not describe what she must have experienced; referring to Sturm's good fortune and Quinn's cruel fate; lamenting the pain of those Cynthia Quinn left behind; degrading defendant by characterizing him as a killer whale; arguing that defendant received the benefit of due process while Cynthia Quinn did not; and urging the community to avenge, and thereby heal.

Defendant's arguments are similar to those raised in *People v Harris* and *People v Cahill*. In *Harris*, the defendant claimed "that the prosecutor invited the jury to punish defendant for exercising his rights to a trial and not to testify, that the prosecutor misstated the record, referred to facts not in evidence, and misused evidence, and that the prosecutor denigrated defendant's defense and inflamed the jury" (98 NY2d at 491 n 18). We held that the claims were unpreserved, and, had we reviewed them, we would have concluded that the statements did not "exceed the broad bounds of rhetorical comment permis-

sible in closing argument" (*id.* [citation omitted]).[8] We came to the same conclusion in *Cahill*, where the defendant argued that "the People made improper remarks throughout the trial, alluding to, among other things, the victim's beauty and courage and defendant's remorselessness" (2 NY3d at 72 n 45).

As in *Harris* and *Cahill*, we conclude that defendant did not properly preserve the claims he makes on appeal. The motion for a mistrial was insufficient to preserve the arguments. Nevertheless, reviewing the merits of the claims, we conclude that while several of the prosecutor's remarks were improper, reversal is not warranted (*see Crimmins*, 36 NY2d at 237).

### III. PENALTY PHASE

We next address the constitutionality of the "deadlock instruction" the court delivered to the jury prior to its deliberation on the appropriate sentence for defendant. Pursuant to CPL 400.27 (10), the court instructed the jurors on their duty to decide whether defendant should be sentenced to death or to life without parole. Either choice had to be unanimous. The court further instructed the jurors, as required by statute, that if they failed to agree, the court would sentence defendant to life imprisonment with parole eligibility after serving a minimum of 20 to 25 years.[9] Although defendant did not object when the instruction was given, he had sought a ruling prior to trial that CPL 400.27 (10) was unconstitutional under the Federal and State Constitutions, both on its face and as applied. His motion preserved the argument for appeal.

Like some other states with death penalty statutes, New York recognized that jurors should know the consequences of a deadlock (*see* Berberich, Note, *Jury Instructions Regarding Deadlock in Capital Sentencing*, 29 Hofstra L Rev 1301, 1324 [Summer 2001]). However, New York's deadlock provision is unique in that the sentence required after a deadlock is less se-

---

8. We noted, "While prosecutors have wide berth to advocate for their case, there are limitations. Specifically, prosecutors 'should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant' " (*Harris*, 98 NY2d at 492 n 18, quoting *People v Ashwal*, 39 NY2d 105, 110 [1976]).

9. CPL 400.27 (10) reads in part, "The court must also instruct the jury that in the event the jury fails to reach unanimous agreement with respect to the sentence, the court will sentence the defendant to a term of imprisonment with a minimum term of between twenty and twenty-five years and a maximum term of life."

vere than the sentences the jury is allowed to consider. No other death penalty scheme in the country requires judges to instruct jurors that if they cannot unanimously agree between two choices, the judge will sentence defendant to a third, more lenient, choice.[10]

Studies have found that jurors tend to "grossly underestimate how long capital murderers not sentenced to death usually stay in prison" (Bowers and Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex L Rev 605, 648 [Feb. 1999]).[11] Jurors' beliefs with respect to the actual number of years a defendant will serve in prison are compelling and can even be decisive. As the study concluded, the "sooner jurors think a defendant will be released from prison, the more likely they are to vote for death and the more likely they are to see the defendant as dangerous" (*id.* at 703). A study of South Carolina jurors who served in capital cases "confirm[ed] that jurors' deliberations emphasize dangerousness and that misguided fears of early release generate death sentences" (Eisenberg and Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L Rev 1, 4 [Nov. 1993]; *see also* Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum L Rev 1538, 1560 [Oct. 1998] [finding that "(f)uture dangerousness appears to be one of the primary determinants of capital-sentencing outcomes"]). Thus, jurors might impose the death penalty on a defendant whom they believed did not deserve it simply because they fear that the defendant would not serve a life sentence.

---

**10.** Contrary to the People's contention, New York's deadlock provision is not similar to the provision upheld by the New Jersey Supreme Court in *State v Ramseur* (106 NJ 123, 524 A2d 188 [1987]). The New Jersey statute provides that the jury must be "informed that a failure to reach a unanimous verdict shall result in sentencing by the court pursuant to subsection b" (NJ Stat Ann § 2C:11-3 [f]). In 2000, the New Jersey Legislature amended subsection (b) so that once a defendant is death-eligible, the alternative to death is life without parole, with life without parole also being the sentence upon a deadlock (2000 NJ Session Law Serv ch 88, Senate No. 530).Thus, the jury can impose the deadlock sentence. The same is also true of two other states that inform jurors of the consequences of a deadlock (*see* Mo Ann Stat § 565.030 [4]; Or Rev Stat § 163.150 [2] [a]).

**11.** The researchers analyzed data compiled by the Capital Jury Project, a continuing research program of capital jurors' sentencing decisions in different states (77 Tex L Rev at 643 n 186, 717). The participating states included California, Florida, Indiana, Kentucky, Pennsylvania, South Carolina, Texas, Virginia, Georgia, Louisiana, North Carolina, Tennessee, New Jersey and Alabama (Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind LJ 1043, 1062-1072, 1078 nn 190-194 [1995]).

These studies provide the best available insight into jury behavior.

The New York Legislature determined that defendants convicted of capital first degree murder should either be sentenced to death or the most severe alternative sentence, life imprisonment without the possibility of parole. What, then, is the consequence of telling the jury that it may not impose a sentence of life with parole eligibility after 20 to 25 years, but that the court will impose that sentence if the jury cannot agree? The deadlock instruction interjects the fear that if jurors do not reach unanimity, the defendant may be paroled in 20 years and pose a threat to society in the future. Yet, in New York a defendant's future dangerousness is not a statutory aggravator the jury may consider.[12]

By interjecting future dangerousness, the deadlock instruction gives rise to an unconstitutionally palpable risk that one or more jurors who cannot bear the thought that a defendant may walk the streets again after serving 20 to 25 years will join jurors favoring death in order to avoid the deadlock sentence. Commentators have been harshly critical of New York's deadlock instruction.[13] For jurors who are inclined toward life without parole, the choice is between death and life with parole, a Hobson's choice in light of the jurors' likely concerns over defendant's future dangerousness. The choice of death results not through "a comparison of views, and by arguments among the jurors themselves," but through fear and coercion (*Jones v United States*, 527 US 373, 382 [1999], quoting *Allen v United*

---

**12.** In contrast, in Texas the jury is asked to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (Tex Code Ann Crim Proc, art 37.071, § 2 [b] [1]). The death penalty statutes of Oregon, Oklahoma, Virginia and Wyoming have similar provisions (*see* Or Rev Stat § 163.150 [1] [b] [B]; Okla Stat Ann, tit 21, § 701.12 [7]; Va Code Ann § 19.2-264.2; Wyo Stat Ann § 6-2-102 [h] [xi]). In most states, as in New York, future dangerousness plays no approved role.

**13.** "The only possible reason for having this cockeyed sentencing scheme—and for insisting that capital jurors be informed of it—is to put pressure on [jurors in the minority] holding out for life to switch to death so that the defendant is not made eligible for parole as a result of a nonunanimous verdict" (Liebman, *The Overproduction of Death*, 100 Colum L Rev 2030, 2118 n 215 [2000]). "Not wanting to risk the possibility of the defendant's release from prison twenty years hence, or believing that such a result would not be just, the jurors holding out for a sentence less than death may conclude that a capital sentence is the only acceptable alternative" (Acker, *When The Cheering Stopped: An Overview and Analysis of New York's Death Penalty Legislation*, 17 Pace L Rev 41, 133 [1996]).

*States,* 164 US 492, 501 [1896]). New York's statute is unique in its coercive effect.

The case closest in point to the one before us because of the instruction given to the jury is *Morris v Woodford* (273 F3d 826 [9th Cir 2001], *cert denied* 537 US 941 [2002]). There, the Court of Appeals for the Ninth Circuit held that because of a mistake, there was a reasonable likelihood that one or more jurors interpreted the court's instructions to mean that if the jury could not agree between death and life without parole, the defendant would be sentenced to life with parole. In other words, the coercive instruction mistakenly given in *Morris v Woodford* is the same instruction actually required here by CPL 400.27 (10). Remanding the case for a new penalty-phase trial, the court concluded that the instructions "would suggest to any holdout juror that, if he or she did not join the majority of the other jurors, then Petitioner would be eligible for parole. That suggestion is, of course, incorrect, and its coercive potential is obvious; in effect, it would place such a juror in the apparent position of choosing between death and life *with* parole" (273 F3d at 841).

Here, the trial court reasoned that it was more likely that jurors favoring life without parole would not switch to death since lack of unanimity would mean that the defendant would remain incarcerated for at least 20 to 25 years, an option preferable to death. But under the existing statute, life with parole was not one of the options available to the jury. New York's Legislature did not intend for jurors to choose life with parole. A juror who purposely chooses that option would fail to abide by the court's instruction to decide between death or life without parole. In any event, a juror who has found defendant guilty of a capital crime, and has heard weeks of arguments and a summation reviling the defendant and detailing the pain he has caused, is more likely to choose death than risk the prospect of defendant ever harming anyone in society again (*see Deadly Confusion, supra,* 79 Cornell L Rev at 12 ["The data suggest that the sentencing phase of a capital trial commences with a substantial bias in favor of death"]).

It is of course possible that one or more jurors who favor death might be coerced into choosing life without parole rather than have defendant be sentenced to life with parole. That, however, does not cure the coercive effect of the deadlock instruction before us. The coercive effect is not relieved by recognizing that some jurors may be coerced in the opposite direction.

■ Because death is qualitatively different, there is a "corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case" (*Woodson v North Carolina*, 428 US 280, 305 [1976]).[14] Whether a juror chooses death or life without the possibility of parole, the choice is driven by the fear that a deadlock may result in the eventual release of the defendant. Under New York's deadlock instruction the choice is not, as it should be, the result of a reasoned understanding that it was the appropriate one. We hold today that the deadlock instruction required by CPL 400.27 (10) is unconstitutional under the State Constitution because of the unacceptable risk that it may result in a coercive, and thus arbitrary and unreliable, sentence.[15]

## A. LEGISLATIVE DEBATE ON THE DEADLOCK INSTRUCTION

The New York State Legislature was aware of the danger that the deadlock instruction might result in coercive verdicts. During deliberations on the death penalty statute, Senator Richard Dollinger addressed the issue of coercion. He asked, "[H]ow do you avoid the problem of a jury that is hung up on the issue of either life in prison without parole or the death penalty of putting additional pressure on the jurors, knowing that if they failed to agree they are going to face a penalty that is less than either of the two penalties that they are currently in dispute over?" (New York State Senate Debate, Mar. 6, 1995, at 1912.) Senator Dale Volker responded that he did not believe the procedure was coercive, stating that in other jurisdictions "there is ample constitutional basis" for that conclusion (*id.*). As Senator Volker explained, "the jury—in order to enact the death penalty, it has to be a unanimous decision. If there's no unanimous deci-

---

**14.** In asserting that the "consequences of a deadlock are no part of a jury's proper concern" (dissenting op at 134), the dissent seems to equate this case with every other criminal proceeding despite the fact that capital cases are anything but ordinary. The elaborate sentencing procedure the Legislature enacted empowers, and indeed requires, a capital jury to determine sentence, whereas in other criminal cases a jury is told specifically, pursuant to CPL 300.10 (2), not to "consider or speculate concerning matters relating to sentence or punishment."

**15.** The dissent distorts the Court's opinion by arguing that it holds the deadlock provision is unconstitutional simply because it might work to the disadvantage of defendants. The truth is that the deadlock provision is unconstitutional because of the risk that it might coerce jurors into giving up their conscientious beliefs in order to reach a verdict. This risk deprives defendants of the well-established right to a fair trial under our case law and the State Constitution.

sion, if they can't arrive at a decision for life without parole, then the judge has the option then to make the decision to sentence the person to 25 years to life" (*id.* at 1912-1913).

Senator Dollinger persisted, asking whether giving the jury all three options had been considered. Senator Volker replied that such a procedure had been considered, as had the alternative of giving the judge the sentencing option of either life without parole or 20 to 25 years to life. The feeling was "if you are going to have a jury enact something as serious as the death penalty, you ought to have a unanimous jury" (*id.* at 1915). Therefore, "the decision was to give the jury the option for the most severe penalties and let them know that if they couldn't choose one of those more severe penalties then the judge would enact the lesser penalty which is 20-25 years to life" (*id.* at 1915-1916). Senator Dollinger again asked, "But isn't it inherently coercive to tell them that you have to do this; otherwise there is going to be another penalty imposed?" (*Id.* at 1916.) Senator Volker replied that there would be a problem if the jury was not informed as to the consequences of a hung jury. He thought that "that would be a much more serious constitutional problem" (*id.*).[16]

## B. GUIDING AUTHORITY

The United States Supreme Court has not ruled on an instruction by which jurors are told that if they cannot agree on a verdict, the defendant will receive a lesser sentence than the ones they must consider. To be sure, the Supreme Court has held that defendants, and capital defendants in particular, are entitled to uncoerced verdicts (*see Lowenfield v Phelps*, 484 US 231 [1988]). In *Simmons v South Carolina* (512 US 154 [1994]), the Court held that if the state makes future dangerousness an issue, and the alternative sentence to death is life without parole, the defendant should be allowed to argue that he is parole ineligible.[17] In other words, "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole" (*id.* at 171). Here, the choice of life

---

**16.** This point is also relevant to our discussion dealing with the infirmity of a statute that contains no deadlock instruction whatever (at 128-131, *infra*).

**17.** *See also Shafer v South Carolina*, 532 US 36 (2001).

without parole is rendered illusory by the fear that failure to unanimously agree will result in a parole eligible sentence.[18]

Moreover, in *Beck v Alabama* (447 US 625 [1980]), the Supreme Court invalidated a death penalty scheme that precluded jurors from considering a noncapital lesser included offense. The Court held that the failure to give jurors the power to convict defendant of the lesser included offense "would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments" (*id.* at 637). The Court explained that "a jury might convict a defendant of a capital offense because of its belief that he is guilty of *some* crime, or, given the mandatory nature of the death penalty under Alabama law, the jury might acquit because it does not think that the defendant's crime warrants death" (*California v Ramos*, 463 US 992, 1007 [1983] [discussing *Beck v Alabama*]). The statute interjected "irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime" (447 US at 642).

Although *Beck* involved the guilt/nonguilt phase, much of its reasoning applies to this case. Here, the statute precludes the jury from considering a third option—one that many jurors might find unpalatable—and yet it instructs that the third option will be imposed upon a deadlock. It thereby improperly interjects future dangerousness, a nonstatutory aggravator, into jury deliberations. It is unclear, however, whether the Supreme Court would apply *Beck*'s reasoning to this case because in *California v Ramos* (463 US at 1009), the Court held that "the risk of an unwarranted conviction is simply not directly translat-

---

**18.** According to the dissent, since the Supreme Court held that a defendant should be allowed to argue that he will not be eligible for parole if the state makes future dangerousness an issue, it follows that a state should be allowed to inform jurors that a defendant might be eligible for parole if they deadlock. New York did not make future dangerousness an aggravator. Thus, the jury should not focus on predicting defendant's future dangerousness. The jury should instead focus on determining whether life or death is the appropriate punishment. The problem is that the deadlock instruction is likely to preclude it from undertaking the appropriate inquiry. What *Simmons* says is that a state may not do one thing (provide that the alternative sentence to death is life without parole) and then argue another (that defendant will pose a future threat to society).

able" to the penalty phase. There, the defendant challenged the instructing of jurors that a life sentence without parole could be commuted by the Governor. The Court found that the instruction focused the jury on the individual characteristics of the defendant and his offense, was accurate, and could be rebutted by defendant.

Subsequently, the California Supreme Court held the instruction unconstitutional on state due process grounds because it was "misleading and because it invites the jury to consider speculative and impermissible factors in reaching its decision" (*People v Ramos*, 37 Cal 3d 136, 159, 689 P2d 430, 444 [1984]). In so holding, the California high court quoted approvingly from the New Jersey decision in *State v White* (27 NJ 158, 177-178, 142 A2d 65, 76 [1958])—as do we:

> "It is no more proper for a jury to conclude that death be the penalty because a life sentence may be commuted or the defendant paroled, th[a]n it would be for a trial judge in other criminal causes deliberately to impose an excessive sentence to frustrate the statutory scheme committing parole to another agency. That death should be inflicted when a life sentence is appropriate is an abhorrent thought."

In concluding that the deadlock instruction is unconstitutional, we are persuaded by the rationale of those two high courts.

The People rely on *Jones v United States* (527 US 373 [1999]) where the defendant argued that because of the trial court's erroneous instruction, the jury believed that the defendant would receive a sentence of less severity than life without parole upon a deadlock. To avoid the possibility of the defendant's possible release, jurors who favored life without the possibility of parole could have changed their votes to death. The defendant had requested the trial court to instruct the jury that in the event of a deadlock, the sentence would have been life without the possibility of parole. In a divided opinion, the Supreme Court initially held that "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree" (*id*. at 381).The Court reasoned that the jury was not "affirmatively misled" by the trial court's refusal to give the proposed instruction, which "has no bearing on the jury's role in the sentencing process" (*id*. at 381, 382). Although the proposed instruction would have been accurate, the Court found that it might undermine the strong governmental inter-

est in securing unanimity. The Court declined to follow state cases that have required jurors to be informed as to the consequences of a deadlock.

Reviewing for plain error, the Court also held that the trial court did not mislead jurors into believing that the deadlock sentence would be of less severity. But even if the court had misled the jurors, the defendant could not "show the confusion necessarily worked to his detriment" since it was "just as likely that jurors, loath to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence" (527 US at 394).

According to the People, the principle underlying *Jones* and *Ramos* is that as long as the information conveyed to the jury is accurate, it need not be balanced. Absent from the Court's discussion in *Jones* is any mention about the heightened need for reliability in death penalty cases. Instead, the Court focused on the importance of securing jury unanimity, and the fact that the jury was not affirmatively misled. New York's deadlock instruction gives jurors accurate information, and tilts toward unanimity. The risk of coercion, however, calls into question the reliability of the jury's determination. Under our case law, the goal of jury unanimity may not undermine sentencing reliability, particularly where the sentence is death.

## C. NEW YORK'S PRECEDENT ON COERCED VERDICTS

We have held that a coerced verdict "ought not to be allowed to stand in any case, and least of all, in one involving a human life" (*People v Sheldon*, 156 NY 268, 285 [1898]). Since *Sheldon*, we have consistently affirmed this principle. In *People v Faber* (199 NY 256, 259 [1910]), we held that "[t]he verdict of a juror should be free and untrammeled. In arriving at a verdict the judge presiding at the court must not attempt to coerce or compel the jury to agree upon a particular verdict, or any verdict" (*see also People v Dawkins*, 82 NY2d 226 [1993]; *Matter of Plummer v Rothwax*, 63 NY2d 243 [1984]; *People v Carter*, 40 NY2d 933 [1976]).

Generally, the source of the coercion has been the trial court. In well-meaning, though misguided, attempts to get juries to reach a decision after all the travails of a trial, courts have given coercive instructions. Although shocking to imagine, there was a time when jurors would be deprived of food and rest until they reached a verdict. In rejecting the practice, Chancellor Kent reasoned that a verdict reached under such conditions is

"founded not on temperate discussion and clear conviction, but on strength of body" and "does not . . . stand with conscience, but is altogether repugnant to a sense of humanity and justice" (*People v Olcott*, 2 Johns Cas 301, 309 [1801], quoted in *People v Sheldon*, 156 NY at 276). In *People v Sheldon*, we expressed sympathy with the trial court's desire to see the case end with a verdict, but concluded that the court "fell into error, and, as a result, very likely coerced some members of the jury into an agreement with their fellow-members against their own personal convictions" (*id.* at 282-283). The error in *Sheldon* was keeping the jurors together in a cramped room for about 85 hours without beds or cots, and giving the impression that they would remain confined for longer if they did not reach a verdict.

Other jury instructions we have invalidated have not been as bluntly coercive as in *Olcott* or *Sheldon.* In *People v Faber*, the trial court instructed that a juror "should join with his co-jurors, and should make in some respects their opinion his own" (199 NY at 258). We held that "[t]he trial judge, in his apparent desire to have the jury agree, inadvertently overlooked the independent, individual and personal character of jurors composing the body who sit to determine controversies" (*id.*). The court's instruction "may have resulted in an agreement by the jury where an agreement would not have been obtained if each juryman in obedience to his right and duty had decided the case upon his own opinion of the evidence and upon his own judgment" (*id.* at 259). When a juror surrenders "conscientious views founded upon the evidence," it must be due to "argument and comparison of views" (*id.* at 261).

In *People v Carter* (40 NY2d 933 [1976]), we relied on *Sheldon* and *Faber* in granting a new trial where the court had instructed the jurors that they would be held incommunicado until they reached a verdict, after the court had learned, during a polling, that a lone juror had voted not guilty. In *Matter of Plummer v Rothwax* (63 NY2d 243 [1984]), the judge declared a mistrial after jurors had declared further deliberations would be fruitless, and this Court found that "it was reasonable for the trial court to avoid any coaxing, inducing or pressuring the jury to return for further deliberations. Such action could have proven coercive and prejudicial and might have resulted in the denial of a fair verdict to the defendant or the People, a verdict which the jury might not otherwise support" (*id.* at 252-253; *see also People v Dawkins*, 82 NY2d 226 [1993]). In *People v Antommarchi* (80 NY2d 247, 252 [1992]), we held that an *Allen*

charge violated the Federal and State Constitutions because it coerced dissenting jurors into articulating a basis for their doubts, and impermissibly shifted the burden of proof. Most recently, we held that a coercive jury instruction deprived defendant of a fair trial (*People v Aponte*, 2 NY3d 304 [2004]).

There are distinctions between the foregoing cases and this case, but they do not warrant a different result. First, while it was the trial court that delivered the deadlock instruction, it did so at the behest of the Legislature, which drafted the instruction. Coercive instructions are improper whether they spring from the mind of an individual judge or the collective mind of the Legislature. Second, the jurors in this case did not express the view that they were deadlocked. But this is not surprising considering that they were given the deadlock instruction before they began their deliberations. What is dispositive is that the jurors in a capital case are given instructions that may coerce them into surrendering their conscientious beliefs. The fear in this case was not that jurors would be deprived of meals or rest, or that failure to agree would have wasted everyone's time. Rather, the motivating fear in the minds of a juror in a numerical minority is likely to be that a vote for life without the possibility of parole is really a vote for life with the possibility of parole.[19]

The dissent asserts that a deadlocked jury amounts to a failure of the system. It would be a far greater failure of the system that, as a result of legislative coercion, an individual could be sentenced to die. If all 12 jurors cannot reach an uncoerced unanimous conclusion that the death penalty is the appropriate sanction, the defendant must not be sentenced to death. Thus, if there is one lone juror who truly believes that the death sentence is not warranted, then a non-death sentence must be

---

**19.** The dissent maintains that requiring an anticipatory deadlock instruction providing for a sentence of life imprisonment without parole could invite life-favoring jurors, who think a life sentence is appropriate, to hold out and create a deadlock, thereby thwarting the will of the majority jurors who wish to impose the death penalty. What the dissent ignores is that holdout jurors can affect the outcomes of jury actions in every sphere of our criminal justice system. If the deadlock sentence had been life without parole, then jurors would have no reason to fear that a deadlock would result in the eventual release of the defendant. In that instance jurors committed to life without parole would not be coerced into giving up their conscientious belief in order to reach a verdict. In the event of a deadlock, the sentence would at least be one that the jury considered. As it stands now, in the event of a deadlock, the defendant might receive a sentence that none of the jurors could have considered or might even have considered palatable.

imposed (*see* CPL 400.27 [11] [a] [the jury may not direct imposition of a sentence of death unless it unanimously finds beyond a reasonable doubt that the aggravating factor(s) substantially outweigh the mitigating factor(s) established, if any, and unanimously determines that the penalty of death should be applied]).

This Court has repeatedly construed the State Constitution's Due Process Clause to provide greater protection than its federal counterpart as construed by the Supreme Court (*Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 159 [1978]). In doing so, we have often found that a Supreme Court rule represents a departure from an earlier rule, which was consistent with our own established law or with fundamental justice and fairness. For instance, in *Cooper v Morin* (49 NY2d 69 [1979]), we rejected a test of what constitutes punishment of pretrial detainees under the Eighth Amendment announced in *Bell v Wolfish* (441 US 520 [1979]), which was less probing than the test enunciated in *Kennedy v Mendoza-Martinez* (372 US 144 [1963]). Under the new test the Supreme Court adopted, a regulation did not violate due process if the regulation "has a legitimate purpose other than punishment and is not excessive in relation to that purpose" (*Cooper v Morin,* 49 NY2d at 79). We regarded that test as "one-sided" and instead adopted a test that balanced "the harm to the individual resulting from the condition imposed against the benefit sought by the government through enforcement" (*id.*). In *People v Vilardi* (76 NY2d 67 [1990]) we remained committed, as a matter of state due process, to the two-tiered framework the Supreme Court had adopted in *United States v Agurs* (427 US 97 [1976]) for analyzing the materiality element of a claim under *Brady v Maryland* (373 US 83 [1963]), rather than signing on to its more recent standard articulated in *United States v Bagley* (473 US 667 [1985]).

In this case, we regard *Jones v United States* (527 US 373 [1999]) as unfaithful to the often repeated principle that death is qualitatively different and thus subject to a heightened standard of reliability (*see Gregg v Georgia,* 428 US 153 [1976]; *Woodson, supra; Beck, supra*). There, rejecting defendant's argument that some jurors were essentially coerced into voting for death out of fear that defendant would receive a lesser sentence upon a deadlock, the Supreme Court found that even if jurors were confused, defendant could not show prejudice since it was just as likely that jurors in favor of death would vote for life imprisonment. As noted, the research evidence indicates that the opposite is more likely.

In any event, a vote for life imprisonment or death, driven by the fear that a defendant might be parole-eligible if jurors fail to reach unanimity, does not satisfy the heightened standard of reliability required by our State Constitution. Moreover, to require a defendant sentenced to death to show actual prejudice would be inconsistent with our case law holding that actual prejudice need not be shown for certain due process violations in noncapital cases (*People v Staley*, 41 NY2d 789, 792 [1977] ["failure to conduct a prompt prosecution, in a proper case, may require dismissal of the indictment even in the absence of prejudice to the defendant"]).

The dissent contends that the majority is ignoring the will of the Legislature. The Court, however, plays a crucial and necessary function in our system of checks and balances. It is the responsibility of the judiciary to safeguard the rights afforded under our State Constitution. While the Legislature may vote to have a death penalty, it cannot create one that offends constitutional rights. Thus, it is necessarily our responsibility to strike down the deadlock instruction in CPL 400.27 (10) because it creates the substantial risk of coercing jurors into sentencing a defendant to death in violation of our Due Process Clause. The deadlock instruction is invalid under our own case law condemning coercive instructions, and the State Constitution's Due Process Clause, providing greater protection than its federal counterpart. Consequently, defendant's death sentence must be set aside.

## D. ABSENCE OF ANY INSTRUCTION

We further conclude that the absence of any instruction is no better than the current instruction under our constitutional analysis, and thus we decline to adopt *Jones*. Like the flawed deadlock instruction, the absence of an instruction would lead to death sentences that are based on speculation, as the Legislature apparently feared when it decided to prescribe the instruction. As the studies previously cited indicate, jurors might fear that the failure to reach a unanimous verdict would lead to a defendant's release, retrial or sentence to an even lesser term than the one currently prescribed in the deadlock scenario. Indeed, a key motivation for jurors to vote for the death penalty is undoubtedly their fear that a defendant will otherwise pose a danger on the streets (*see* Garvey, 98 Colum L Rev at 1559-1560; *see also* Blume, Garvey and Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L Rev 397 [2001]). Our State Constitution does not permit a

death sentence imposed by jurors who may have chosen that option based on rank speculation about a defendant's eventual release into society.

The Attorney General points out, and the dissent recognizes, that the Legislature sought to fulfill the twin aims of minimizing juror speculation by providing an instruction, and encouraging unanimity. Our conclusion today identifies the preeminence of reducing juror speculation. As the Attorney General acknowledges (while supporting the constitutionality of the existing instruction), "[i]f no deadlock instruction is given, and jurors are kept in the dark as to what will happen in the event they cannot decide on sentence, speculation will flourish. As the research . . . demonstrates, this speculation is almost always to the defendant's detriment." (Attorney General's Brief at 41.)

As noted, the *Jones* court held that "the Eighth Amendment [to the Federal Constitution] does not require that the jurors be instructed as to the consequence of their failure to agree" (527 US at 381). It bears reiterating here that "on innumerable occasions this [C]ourt has given [the] State Constitution an independent construction, affording the rights and liberties of the citizens of this State even more protection than may be secured under the United States Constitution" (*Sharrock v Dell Buick-Cadillac,* 45 NY2d at 159).[20] We hold that in this case the Due Process Clause of the New York Constitution requires a higher standard of fairness than the Federal Constitution as interpreted by the *Jones* majority (*see* NY Const, art I, § 6 ["No person shall be deprived of life, liberty or property without due process of law"]).[21]

In *Sharrock,* we noted that "historical differences between the Federal and State [D]ue [P]rocess [C]lauses make clear that they were adopted to combat entirely different evils" (45 NY2d at 160). Prior to the Fourteenth Amendment, the Federal Due Process Clause offered "virtually no protections of individual liberties" while "State Constitutions in general, and the New York Constitution in particular, have long safeguarded any

---

**20.** *See also Cooper v Morin,* 49 NY2d at 79 ("We have not hesitated when we concluded that the Federal Constitution as interpreted by the Supreme Court fell short of adequate protection for our citizens to rely upon the principle that that document defines the minimum level of individual rights and leaves the States free to provide greater rights for its citizens through its Constitution, statutes or rule-making authority").

**21.** See also brief of amicus curiae, the Cornell Death Penalty Project, submitted in *People v Harris* (98 NY2d 452 [2002]).

threat to individual liberties" (*id.*). New York "recognized that unreasonable delay in prosecuting a defendant constitutes a denial of due process of law" before the Supreme Court similarly broadened the federal constitutional right to a speedy trial (*see People v Staley*, 41 NY2d 789, 791 [1977]). Similarly, our State Constitution provided a basis for the right to counsel well before the Supreme Court recognized comparable rights federally (*see People v Settles*, 46 NY2d 154, 160 [1978]). Now, recognizing the gravity of capital punishment and the concomitant need for greater certainty in the outcome of capital jury sentences, we hold that providing no deadlock instruction in the course of capital sentencing violates our Due Process Clause. Our conclusion is buttressed by the clear legislative intent that there be a jury instruction on the consequences of a deadlock.

We thus join eight other states that have determined, by court rule (Delaware, Louisiana and New Jersey) or legislative enactment (Idaho, Missouri, Oregon, Pennsylvania and Wyoming), that a jury instruction on the consequences of deadlock is required in a capital case. In *State v Williams*, the Louisiana high court, on rehearing, presciently considered whether a trial judge must inform jurors in a capital sentencing hearing that a defendant will be sentenced to life imprisonment "without benefit of probation, parole or suspension of sentence" (392 So 2d 619, 633 [La 1980]), if they are unable to reach a unanimous decision. The *Williams* court observed that because jurors were kept in the dark, they were left to speculate about the outcome if they could not agree, and "could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required" (392 So 2d at 634). The obvious danger in this type of speculation "may have swayed a juror to join the majority, rather than hold to his honest convictions" (*id.*).

Relying on Eighth Amendment principles, the *Williams* court concluded that the penalty of death had been imposed under a procedure that "created a substantial risk that it would be inflicted in an arbitrary and capricious manner" (*id.* at 635). Similarly, in *Whalen v State* (492 A2d 552, 562 [Del 1985]), the Supreme Court of Delaware concluded that a trial court's failure to adequately inform jurors that a failure to unanimously agree on a sentence of death would lead to a sentence of life without parole was a "substantial denial of the defendant's constitutional rights."

In New Jersey, the Supreme Court acted in the exercise of its supervisory powers and was "guided as well by the constitu-

tional imperative in a capital case that jurors be made to understand the ultimate consequences of their decision" (*State v Ramseur*, 106 NJ at 309, 524 A2d at 283). Like us, the New Jersey court rejected the rationale of some other state courts which concluded that a trial court is not obligated to inform a capital jury of the consequences of its inability to agree.

We cannot, however, ourselves craft a new instruction, because to do so would usurp legislative prerogative. We have the power to eliminate an unconstitutional sentencing procedure, but we do not have the power to fill the void with a different procedure, particularly one that potentially imposes a greater sentence than the possible deadlock sentence that has been prescribed. As the Court noted in *People v Gersewitz* (294 NY 163, 169 [1945]), we have "no power to supply even an inadvertent omission of the Legislature."[22] We thus conclude that under the present statute, the death penalty may not be imposed. Cases in which death notices have been filed may go forward as noncapital first degree murder prosecutions.

E. REMEDY

CPL 470.30 (1) authorizes this Court to take corrective action upon a reversal or modification. CPL 470.30 (5) (c) authorizes this Court to "set the sentence aside and remand the case for resentencing by the court for a determination as to whether the defendant shall be sentenced to life imprisonment without parole or to a term of imprisonment for the class A-I felony of murder in the first degree other than a sentence of life imprisonment without parole." Pursuant to these provisions, the case should be remitted to the trial court for imposition of a sentence of life imprisonment without parole or a sentence with a minimum of 20 to 25 years and a maximum of life. In light of our conclusion, the remaining penalty phase claims are academic.

Accordingly, the judgment should be modified by vacating the sentence of death and remitting to Supreme Court, Suffolk

---

**22.** Indeed, in *People v Smith* (63 NY2d 41, 79 [1984]), we declined to rewrite the death penalty statute to provide the constitutionally-required mitigating factors. Rejecting the Attorney General's proposal that the Court construe the death statute in a manner that would pass constitutional muster, we found that this would be "wholly at odds with the wording of the statute and would require us to rewrite the statute" (*id.*). We recognized that the court in *United States v Harper* (729 F2d 1216 [9th Cir 1984]) faced a similar dilemma. It held that the death penalty provisions in the federal Espionage Act could not "be saved by judicial formulation of the missing, but essential, statutory guidelines" finding that "the guidelines must come from Congress, not from the courts" (*id.* at 1226, 1225; *see also State v Cline*, 121 RI 299, 303, 397 A2d 1309, 1311 [1979]).

County for resentencing in accordance with CPL 470.30 (5) (c) and Penal Law §§ 60.06 and 70.00 and, as so modified, affirmed.

ROSENBLATT, J. (concurring). Declaring a statute unconstitutional is not a celebratory event, but from time to time a necessary part of the judicial function and a pillar of our system of checks and balances. With that in mind, I write separately to emphasize why I fully concur with the Court.

While cogent, the dissent goes too far in asserting repeatedly that the Court is substituting its own preferences for the Legislature's. Many trial judges in the United States and in New York (myself included) have not shrunk from imposing death sentences on defendants even though, as judges, we might have qualms about it. The dissent makes this point, stating that it recognizes the Court's "obvious discomfort with the death penalty—indeed we [the dissenters] may share that discomfort." (Dissenting op at 149.) I take this as my colleagues' reminder—an apt and timely one—that judges should subordinate their personal predilections to the legislative will.

But there is another side of the coin, no less compelling. Just as judges should not shrink from carrying out the legislative will, so too should they not shrink from declaring statutes unconstitutional in proper cases, however distasteful *that* may be. In both instances, criticism (and occasionally, cynicism) is inevitable (e.g., "the court did not have the stomach to declare the death penalty law unconstitutional" or, from the other side, "the court did not have the stomach to carry out the death penalty").

My assessment is that most often, and surely in the case before us, judges are ruled not by their stomachs but by their minds, their judicial experience, and their constitutional training and analysis. Without doubt, that is true of the Court's decision today. The same, I am prepared to say, is true of the dissent. Although I disagree with it, I ascribe to it no personal or ideological bias any more than I do to the Court's writing. The case before us involves a difference of opinion on a point of constitutional law, and I side firmly with the Court.

The deadlock instruction at hand is coercive. Granted, it can coerce both ways. Death-prone jurors may well come over to life without parole so as to be assured that the defendant will never be released. But it is no less likely that the life without parole jurors will vote for death because it is the only way to guarantee that the defendant will always remain behind bars.

In terms of symmetry, this is nicely balanced, but as a constitutional matter it does not add up. If 5 of 10 defendants are executed based on coercion, there is little comfort knowing that the other five will be spared the death penalty. Sparing five does not offset the improper execution of the other five. This is not a point of personal predilection. A calculation of that kind simply cannot withstand scrutiny under our State Constitution.

The deadlock instruction is a critical part of the capital case machinery, and in holding it unconstitutional, the Court is not acting on some trifling or arcane technicality. The trial judge gives the jury the deadlock instruction at an exquisitely crucial time. It is a signpost at the very crossroads of life and death. If the directions are omitted or coercive, it could wrongfully mean someone's life. I stress this because no one should suppose that the Court is engaging in a didactic exercise involving angels dancing on the heads of pins. Contrary to the dissent's assertion, it is not part of a design to devise creative obstructions to the death penalty. Deadlock instruction jurisprudence is, literally, a matter of life and death, and the Court is right to declare that an execution based on an unreliable sentencing verdict is constitutionally unacceptable and cannot be justified in the name of deference to the Legislature.

I cannot imagine that the Legislature intended to coerce jurors into unreliable verdicts when it determined that a deadlock instruction was required. But neither can I imagine that, since the founding of our Republic, lawmakers deliberately have set out to draft unconstitutional statutes in hundreds of cases in which American courts have declared those statutes unconstitutional.

No other jurisdiction has enacted a deadlock instruction like this one. While I surely sense nothing willful or pernicious in the Legislature's motivation, it remains that the instruction is inexplicable and fatally defective.

Finally, for the reasons convincingly expanded upon by the Court, I agree that leaving the statute with no deadlock instruction at all is constitutionally untenable and that, as the Court has explained, it would be impermissible for us to rewrite or restructure the law. The dissent asserts that the Court's result is astonishing. For my part, under constitutional analysis, the Court can come to no other result.

R.S. SMITH, J. (dissenting). The Court today renders New York's death penalty statute unenforceable on the ground that

the statute fails to afford death penalty defendants a newly discovered constitutional right: the right to a penalty phase trial before a jury that is told, in advance, that a hung jury guarantees the same sentence that would result from a verdict of life imprisonment. The existence of such a right finds no support in precedent, and none in logic except on the premise that death penalty defendants are constitutionally entitled to every procedural advantage the human mind can devise. We dissent, and would hold that the deadlock instruction required by Criminal Procedure Law (CPL) § 400.27 (10) is not unconstitutionally coercive; that the statutory language requiring that instruction, even if invalid, is severable from the other statutory provisions authorizing the death penalty; and that the statute without the instruction is enforceable.

I

CPL 400.27 (10) sets forth the procedure to be followed at the penalty phase of a death penalty trial. The provision the majority holds unconstitutional is the fifth sentence of the section, which provides:

> "The court must also instruct the jury that in the event the jury fails to reach unanimous agreement with respect to the sentence, the court will sentence the defendant to a term of imprisonment with a minimum term of between twenty and twenty-five years and a maximum term of life."

The majority is correct in saying that this is an unusual provision, apparently with no counterpart in the laws of other states. It is quite possible to question the wisdom of this statute, and to believe that a different provision on the subject (or no provision at all) would have been a better choice. But an act of the Legislature is not unconstitutional because it is unique or because its wisdom may be questioned. This statute is constitutional unless obedience to its command violates due process by depriving a defendant of a fair trial. In our view, it meets this test.

The statute addresses the problem of what, if anything, to tell a jury in advance about the consequences of the jury's failure to reach unanimous agreement. The usual procedure is to tell jurors nothing—an approach for which there is much to be said. The consequences of a deadlock are no part of a jury's proper concern. A jury's job is to arrive unanimously at a verdict, if it can. If it cannot overcome its disagreements, its job is simply to

report its inability to reach a verdict, let the consequences be what they may. In accordance with these principles, it is the normal procedure, both in death penalty and non-death penalty cases, to omit all reference to the consequences of a deadlock from the court's initial instructions to the jury.[1]

Thus, we think it quite clear that a legislature could properly choose *not* to require an "anticipatory" deadlock instruction—and we are astonished, as we explain further in the next section of this opinion, that the majority today holds otherwise. We also believe, however, that a legislature constitutionally may, as New York's Legislature did, decide that an anticipatory deadlock instruction is desirable. The Legislature did not have to, but could, guard against the possibility that jurors left in the dark about the consequences of a deadlock will speculate, and that the speculation may distort their deliberations. If the jury at the penalty phase of a death penalty trial conjectures, mistakenly, that a deadlock will result in a new trial and the significant delay, inconvenience and expense that would entail, some jurors may, consciously or not, be inclined to forego their own views for the sake of unanimity. To avoid the possibility that a verdict may be the result of inaccurate guesswork, the Legislature may choose to assure that jurors are accurately informed about the consequences of their failure to agree.

Plainly, the majority here finds nothing wrong with the principle of giving jurors information about the consequences of a deadlock—on the contrary, it finds an anticipatory deadlock instruction to be constitutionally required. The majority seems to recognize that the deadlock instruction required by New York's Legislature may be better for defendants, in many cases, than the traditional approach of leaving the jury in the dark. But the majority holds that the specific deadlock instruction provided in New York's statute is unconstitutional, because it might sometimes work to the defendant's disadvantage.

The majority objects to the instruction required by the statute because it tells the jury that the sentence in case of deadlock will be life imprisonment with the possibility of parole after either 20 or 25 years—a less severe sentence than either of the two (death or life without parole) for which the jury may return a verdict. The majority suggests that, since jurors may find the possibility of parole for someone who has committed first degree murder unacceptable, jurors who are result-oriented—who are

---

1. See the summary of practices in other jurisdictions below (at 144).

willing to go along with a verdict they do not like, in order to avoid a less palatable alternative—may be induced to compromise and avoid a deadlock.

This inducement to compromise can work either way. Indeed, in principle it is more likely to cause a pro-death juror to vote for life than the other way around. This is because a juror who favors the death penalty in a particular case will almost invariably prefer life without parole to a sentence that makes the defendant parole-eligible. But a juror opposed to the death penalty in a particular case may or may not be willing to accept that penalty in preference to a sentence of 20 or 25 years to life.

Admittedly, the theoretical possibility exists that, in some cases, a juror who favors a life without parole sentence will be motivated by the statutorily-required instruction to agree to a death sentence.[2] But our State Constitution has never been, and should not be, held to require the elimination from the system of every possibility of juror compromise. Jurors prone to compromise, like holdout jurors, "can affect the outcomes of jury actions in every sphere of our criminal justice system" (majority op at 126 n 19)—and the Constitution does not require giving preference to holdout over compromise.

Assuming that some jurors are result-oriented, *any* anticipatory deadlock instruction may affect their deliberations: it may provide some jurors either with an incentive to avoid a deadlock or an incentive to create one. The alternative instruction that New York's Legislature might have chosen would say that the result of a deadlock will be life without parole, the same result as a unanimous penalty-phase verdict in the defendant's favor. That instruction is an obvious invitation to a deadlock. It says to every juror who does not want to impose a death sentence: "If you hold out, you win." The Legislature could reasonably have decided that offering this kind of encouragement to a hung jury was undesirable. The purpose of a jury trial is to obtain a verdict, and when a jury disagrees the system has failed.

---

**2.** The majority suggests that studies of juror misconceptions about the time a defendant will actually serve, and the impact of those misconceptions on sentencing, show that this possibility is a likely one (majority op at 117-118). But the studies the majority cites were done largely in states where courts or legislatures permit sentencing juries to consider the question of "future dangerousness." It is unsurprising that many jurors in these states may be preoccupied with the question of when the defendant will be released from prison, but the studies shed little light on what New York jurors will do in making sentencing decisions, and even less on how, if at all, they will be influenced by an anticipatory deadlock instruction.

New York's Legislature chose to steer a middle course between telling jurors nothing about the consequences of a deadlock (thus perhaps encouraging speculation) and telling jurors that a deadlock is the equivalent of a verdict for life (thus encouraging deadlock). While most other states have chosen to pursue one of two goals—either avoiding speculation or encouraging unanimous verdicts—it was a reasonable legislative judgment for New York to value both goals, and try to advance them both. Neither the State nor Federal Constitution requires the Legislature to subordinate one goal to the other.

Our analysis of the case law confirms our view that the Legislature's chosen deadlock instruction is not unconstitutional. It is clear that, at least in noncapital cases, it is not forbidden to warn a jury that a deadlock may have adverse consequences. In *United States v Smith* (857 F2d 682 [10th Cir 1988]), for example, the court upheld an *Allen* charge stating: "If you fail to reach a verdict, the parties *will* be put to the expense of another trial and *will* once again have to endure the mental and emotional strain of a trial" (*id.* at 684). Instructions to this effect (usually not "anticipatory," but given after a jury has indicated difficulty in reaching agreement) are not unusual (*see e.g. Freeman v State*, 115 SW3d 183, 186 [Tex App 2003]; *State v Vega*, 789 A2d 896, 898 [RI 2002]; *Wright v State*, 274 Ga 305, 306-307, 553 SE2d 787, 789 [2001]; *People v Cowen*, 249 AD2d 560 [2d Dept 1998], *lv denied* 92 NY2d 895 [1998]; *State v Whitaker*, 255 Kan 118, 125, 872 P2d 278, 285 [1994]; *Wiggins v State*, 429 So 2d 666, 669 [Ala Crim App 1983]; *Griffin v State*, 2 Ark App 145, 148-149, 617 SW2d 21, 23 [1981]; *see also* Annotation, *Instructions Urging Dissenting Jurors in State Criminal Case to Give Due Consideration to Opinion of Majority [Allen Charge]—Modern Cases*, 97 ALR3d 96, § 2 [a]; §§ 3, 14 [b]).

There seem to be no appellate cases considering whether it is constitutional to tell a jury, where the law so provides, that the effect of a jury deadlock will be to make a defendant eligible for parole. Courts have, however, repeatedly considered an analogous question: May a jury be told that, if it chooses a life sentence over a death sentence, the defendant may some day go free? The law is quite clear that, as long as the information given to the jury is accurate, it is not unconstitutional to make a jury aware that a defendant sentenced to life may be released.

This precise question was decided in *California v Ramos* (463 US 992 [1983]). At issue in that case was a California statute

requiring a jury to be told that "a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole" (*id.* at 996). The Court held that this instruction did not offend the Federal Constitution. It was entirely proper, in the Court's view, to invite the jury to consider, as a factor weighing in favor of a death sentence, the undesirable possibility that the defendant might "be permitted to return to society" (*id.* at 1003).

By contrast, it has repeatedly been held that it is unconstitutional to *mislead* a jury into believing that a defendant, if sentenced to life imprisonment, may someday be released. That was the holding in *Simmons v South Carolina* (512 US 154 [1994]), in which the Court held that, where the life sentence that the jury considered was, by state law, life without parole, the Constitution required that the jury be informed of that fact. Justice Blackmun's plurality opinion noted that to withhold the information from the jury could reasonably have led to a "misunderstanding" that the jury faced "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration" (*id.* at 161). Similarly, in *Morris v Woodford*, the court set aside a death sentence where, because of a typographical error, a jury was given the impression that a verdict of life would mean life "*with* the possibility of parole" (273 F3d 826, 837 [9th Cir 2001]). The majority says that *Morris* is "[t]he case closest in point" here (majority op at 119), but in a crucial respect it is not in point at all, because the impression given the jury in *Morris* was false.

*Simmons* itself makes clear that, where the possibility of parole really exists, making the jury aware of it violates no constitutional right. Justice Blackmun, speaking for four members of the *Simmons* court, said that "nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release" (512 US at 168). Justice O'Connor's concurring opinion for three Justices agreed ("[i]n a State in which parole is available, the Constitution does not require [or preclude] jury consideration of that fact" [*id.* at 176]), as did Justice Scalia's dissent for himself and Justice Thomas ("the Court has noted that 'the wisdom of the decision to permit juror consideration of [postsentencing contingencies] is best left to the States' " [*id.* at 183, quoting *Ramos*, 463 US at 1014]). Thus, in *Simmons*, all nine Justices recognized that, where a life sentence will make a de-

fendant eligible for parole, a jury may constitutionally be told so.[3]

It follows logically that, where—as under New York's statute—a deadlocked jury will make a defendant eligible for parole, that fact too may be communicated to the jury. The defendant's interest in being free from "coercion" is no greater where the defendant is seeking a hung jury than it is where he is seeking a verdict. Indeed, his interest in an uncoerced *verdict* in his favor is arguably more worthy of protection, for a verdict, not a hung jury, is the desired and intended outcome of a jury trial.

The majority implicitly agrees that, in deciding what a jury may be told about the consequences of a deadlock, we may look to cases involving the jury's knowledge of the consequences of a verdict. The majority relies on *Beck v Alabama* (447 US 625 [1980]), in which the Court held that the death penalty could not be imposed for the offense of "robbery-intentional killing" where an Alabama statute prohibited allowing a jury to convict for the lesser included offense of felony murder. In the view of the *Beck* court, the Alabama procedure created an unacceptable risk that the jury would "convict for an impermissible reason— its belief that the defendant is guilty of some serious crime and should be punished," even where the jury was not convinced that the defendant was guilty of the capital offense beyond a reasonable doubt (*id.* at 642).

In substance, then, the *Beck* court held the Alabama procedure unconstitutionally coercive. But it was coercive because it forced the jury to choose between conviction on the capital offense and *acquittal*—not between a death sentence and a sentence of 20 or 25 years to life (*id.* at 642-643). We accept the majority's premise that *Beck* is relevant to what may be said in an anticipatory deadlock instruction. *Beck* no doubt implies that an instruction would be unconstitutionally coercive if it told the jury that a deadlock would set the defendant free at once. But, by the same logic, *Ramos* and *Simmons* establish that it is not unconstitutionally coercive to tell the jury that a deadlock will produce a life sentence with the possibility of parole.

---

3. The practice under a prior New York death penalty statute was consistent with this principle. Former Penal Law § 1045-a (4) required that a sentencing jury be instructed on "the law relating to the possible release on parole of a person sentenced to life imprisonment" (L 1963, ch 994, § 2; *see People v Dusablon*, 16 NY2d 9, 18 [1965]). We are aware of no authority suggesting that this requirement violated the State or Federal Constitution.

In addition to its reliance on *Beck*, the majority relies on the general proposition that coerced verdicts are bad—a proposition with which, in principle, no one can disagree. It is clear that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body" (*Lowenfield v Phelps*, 484 US 231, 241 [1988]). *Lowenfield* also holds, however, that not every instruction that prods a jury to reach a verdict is " 'coercive' in such a way as to deny . . . any constitutional right" (*id.*). The majority opinion appears to recognize that under the Supreme Court's interpretations of the Federal Constitution in *Ramos* and in *Jones v United States* (527 US 373, 394 [1999]) (which we discuss in part II [B] of this opinion), New York's deadlock instruction would pass muster (majority op at 122-124). Yet the majority holds that our State Constitution requires a different result.

In search of support for this view, the majority reaches all the way back to the days when jurors were "deprived of food and rest until they reached a verdict" or kept "in a cramped room for about 85 hours without beds or cots" (majority op at 125)—not very compelling analogues to the present case. Turning to more modern jurisprudence, the majority relies on cases where we found that particular versions of an *Allen* charge went too far in encouraging a jury to reach a verdict (majority op at 125-126). But these cases do not come close to supporting the majority's reading of a new constitutional right into our State's Due Process Clause. We have never relied on a distinct interpretation of the State Constitution in *Allen* charge cases, and we regularly cite federal authority in support of our holdings (*see e.g. People v Aponte*, 2 NY3d 304, 309 [2004], citing *Lowenfield*, 484 US at 240, and *United States v United States Gypsum Co.*, 438 US 422, 462 [1978]). Indeed, we generally do not invoke either the State or Federal Due Process Clause in deciding the propriety of an *Allen* charge. *People v Antommarchi* (80 NY2d 247, 252 [1992]) is an exception, but it relies on both the State and Federal Due Process Clauses, suggesting no distinction between the two.

The instructions involved in our *Allen* charge cases are distinguishable from New York's anticipatory deadlock charge in several important ways. An *Allen* charge is, ordinarily, a supplemental instruction given to a jury that has indicated it is having difficulty reaching agreement. It directs jurors to return to the jury room, to consult with one another and to deliberate honestly by considering the views of others without surrender-

ing their own conscientiously held beliefs (*see* 1 CJI[NY] 42.60 [1983]). An instruction that tells a struggling jury to give deliberations another try has far more potential to be coercive than a part of the main charge, given before any problem has arisen, that informs the jury of the legal consequences of a deadlock (*see People v Ali*, 47 NY2d 920 [1979] [pointing out that *Allen* charges have less coercive potential when the jury's duty to listen to and consider the views of other jurors is described along with their other responsibilities]). The Legislature thus minimized the risk of coercion in capital cases by providing for an *anticipatory* deadlock instruction.

Despite the risk of coercion inherent in supplemental *Allen* charges, we have upheld them in many cases (*see e.g. People v Pagan*, 45 NY2d 725 [1978]), and where we have not upheld them it is for particular reasons—because the court belittled the seriousness of the decision facing the jury, threatened to sequester the jury indefinitely, singled out jurors holding the minority view, or gave an unbalanced charge that demanded a verdict without cautioning jurors not to surrender conscientiously held beliefs (*see e.g., People v Riley*, 70 NY2d 523 [1987]; *People v Diaz*, 66 NY2d 744 [1985]; *People v Carter*, 40 NY2d 933 [1976]). The anticipatory deadlock instruction of CPL 400.27 (10) suffers from none of these infirmities. To the extent that it may encourage a verdict, it does not depart from our *Allen* charge jurisprudence, which makes clear that that is an entirely permissible function of an instruction (*Aponte*, 2 NY3d at 308).

In short, the deadlock instruction of CPL 400.27 (10) is consistent with our *Allen* charge cases. But even if it were not— even if we would disapprove this charge, had a trial court given it without statutory authority—that would not make it unconstitutional. The Legislature has prescribed this particular instruction, and we must defer to the Legislature's wishes if there is any basis on which the enactment may be sustained (*see Matter of Atkinson v City of New York*, 96 NY2d 809, 810 [2001]; *Matter of Jacob*, 86 NY2d 651, 667 [1995]; *Bennett v County of Nassau*, 47 NY2d 535, 540 [1979]; *People v O'Brien*, 111 NY 1, 57 [1888]). To hold that because, in the majority's view, the statutorily-prescribed instruction says more than we would approve in an *Allen* charge, that instruction violates the Due Process Clause is a logical leap that the majority completely fails to justify. The majority has confused its own policy preferences with what the Due Process Clause requires.

We would hold that the anticipatory deadlock instruction provided in CPL 400.27 (10) is permissible under the United States and New York Constitutions.

## II

Having found the deadlock instruction required by statute to be unconstitutional, the majority might be expected to consider whether it is severable from the remainder of the death penalty statute. The majority opinion, however, does not mention the issue of severability. Rather, it concludes that "under the present statute, the death penalty may not be imposed" (majority op at 131)—not because the deadlock instruction and the death penalty are not severable, but because, according to the majority, *some* deadlock instruction is constitutionally required, and the instruction can be fashioned only by the Legislature, not the Court.

We believe that the instruction and the rest of the statute are obviously severable. We also believe that the majority's holding that a deadlock instruction is constitutionally required embodies an extreme version of the error we have already discussed—substituting the majority's policy preferences for those of the Legislature.

## A

The issue of severability is not at all difficult in this case. Addressing that issue "requires first an examination of the statute and its legislative history to determine the legislative intent and what the purposes of the new law were, and second, an evaluation of the courses of action available to the court in light of that history to decide which measure would have been enacted if partial invalidity of the statute had been foreseen" (*Matter of Westinghouse Elec. Corp. v Tully*, 63 NY2d 191, 196 [1984]). Here, "the legislative intent" and "the purposes of the new law" are not in doubt. The primary legislative purpose in enacting chapter 1 of the Laws of 1995 was "[t]o allow for the imposition of the death penalty upon a defendant's conviction for certain types of intentional murder" (*see* Bill Jacket, L 1995, ch 1, at 20 [Mem of Assembly Codes Comm]; *see e.g. id.* at 5 [Governor's Approval Mem], at 13 [Governor's Program Bill Mem], at 44 [Attorney General's Mem]). Nor is there any doubt of what the Legislature would have done "if partial invalidity of the statute had been foreseen." The Legislature expressly said that "[i]f any section, part or provision of this act shall be

declared unconstitutional . . . such declaration shall be limited to the section, part or provision directly involved in the controversy in which such declaration was made and shall not affect any other section, part of provision thereof" (L 1995, ch 1, § 37).

Nor is there any mechanical obstacle to severance here. The offending provision of the statute consists of one sentence from CPL 400.27 (10), which is quoted in this opinion (at 134). No other part of the death penalty statute refers to, or logically depends on, this provision, and to excise it is as simple as taking out a pencil and drawing a line.

We thus conclude that the portion of the death penalty statute found unconstitutional here is severable from the remainder of the statute. The majority does not indicate that it disagrees.

## B

The majority, however, concludes that the statute without the fifth sentence of CPL 400.27 (10) is unenforceable absent legislative action. The flaw in the statute shorn of the deadlock instruction, according to the majority, is that it does not affirmatively reassure jurors that a deadlock is a safe option. According to the majority, any jury instruction that is silent on the subject of the consequences of failure to agree is constitutionally forbidden because the court's silence may lead jurors to engage in "rank speculation about a defendant's eventual release into society" (majority op at 129), and their speculation may in turn lead them to acquiesce in a verdict they would otherwise resist. The majority therefore holds that the State Constitution requires that a deadlock instruction be given.

We find this, as we have said, an astonishing holding—much more so than the holding, with which we disagree, that the deadlock instruction chosen by the Legislature is unconstitutional. In invalidating that instruction, the Court strikes down a very unusual, indeed unique, statute. But in holding that the Constitution affirmatively requires a different instruction and forbids a jury charge that is silent on the subject of deadlock, the Court invalidates a procedure that always has been and still is followed almost everywhere—a procedure not only tested by time, but supported by weighty policy considerations. The majority's holding contradicts the view of the United States Supreme Court, and is supported by no precedent in this or any other jurisdiction. We perceive no basis for it except the majority's refusal to countenance any procedure in a capital

case other than the procedure thought least likely to produce a death sentence.

The practice of giving no anticipatory instruction on the consequences of a deadlock—the practice the majority holds unconstitutional—is the norm in this country. Outside the death penalty area, it is not unknown for the court's initial charge to mention that a hung jury will result in a retrial (*e.g. People v Casner*, 20 Ill App 3d 107, 312 NE2d 709 [1974]), but silence on this subject is the general rule. In death penalty cases, some states follow the majority's preferred procedure of telling the jury that a deadlock on sentencing will have the same result as a verdict for a life sentence, but most do not. Of the 37 states besides New York that have capital punishment, we are aware of only eight that employ an anticipatory instruction about the result of a deadlock. In none of these states has it been held that the instruction was necessary as a matter of due process. Five states have statutes requiring such a deadlock instruction,[4] and courts in three states have adopted it in the exercise of their supervisory powers.[5] Courts in 11 other states, however, have declined to hold that a deadlock instruction should be given.[6]

---

**4.** *See* Idaho Code § 19-2515 (7) (2004); Mo Ann Stat § 565.030 (4) (4) (2004); Or Rev Stat § 163.150 (2) (a) (2004); 42 Pa Cons Stat Ann § 9711 (a) (1); (c) (1) (iv) (2004); Wyo Stat Ann § 6-2-102 (b), (d) (ii) (2004).

**5.** (*See State v Williams*, 392 So 2d 619, 634-635 [La 1980]; *Whalen v State*, 492 A2d 552, 560 [Del 1985]; *State v Ramseur*, 106 NJ 123, 310-311, 524 A2d 188, 283-284 [1987].) As the majority notes (majority op at 130-131), these cases rely in part on cases interpreting the Constitution, but all of them, fairly read, rest on the supervisory power of the states' highest courts. The Louisiana, Delaware and New Jersey courts had no occasion to decide, and did not decide, that a death penalty statute would be unenforceable if it did not authorize an anticipatory deadlock instruction.

**6.** *See State v Johnson*, 298 NC 355, 369-370, 259 SE2d 752, 761-762 (1979); *Justus v Commonwealth*, 220 Va 971, 979, 266 SE2d 87, 92 (1980); *Houston v State*, 593 SW2d 267, 278 (Tenn 1980), *overruled on other grounds by State v Brown*, 836 SW2d 530 (Tenn 1992) (upholding statutory prohibition against deadlock instruction); *State v Adams*, 277 SC 115, 124, 283 SE2d 582, 587 (1981), *overruled on other grounds by State v Torrence*, 305 SC 45, 406 SE2d 315 (1991); *Whisenhant v State*, 482 So 2d 1225, 1236-1237 (Ala Crim App 1982), *affd in part* 482 So 2d 1241 (Ala 1983); *Calhoun v State*, 297 Md 563, 595, 468 A2d 45, 60 (1983), *cert denied* 466 US 993 (1984); *Stringer v State*, 500 So 2d 928, 945 (Miss 1986); *People v Kimble*, 44 Cal 3d 480, 514-516, 749 P2d 803, 824-826 (1988), *cert denied* 488 US 871 (1988) (relating to state's 1977 statute); *Fox v State*, 779 P2d 562, 574 (Okla Crim App 1989); *Nobles v State*, 843 SW2d 503, 508-509 (Tex Crim App 1992); *Fugate v State*, 263 Ga 260, 263, 431 SE2d 104, 108 (1993).

The states that refuse to tell capital sentencing juries that a deadlock is the equivalent of a life verdict have valid reasons for their choice. We have already mentioned those reasons, but they bear repeating. To say that a deadlock has the same result as a verdict of life is to invite a deadlock—to tell every juror that he or she may, if so inclined, achieve a life sentence merely by ignoring the views of 11 other jurors. While hung juries are sometimes inevitable, it should not be the purpose or effect of a jury instruction to encourage them. Remaining silent about the consequences of deadlock encourages jurors to focus on their proper task—agreeing, if possible, on a verdict satisfactory to all—and not on the possible advantages of achieving a breakdown in the system.

This line of reasoning was given significant weight by the United States Supreme Court in *Jones v United States* (527 US 373 [1999]), where the Court squarely rejected the argument the majority accepts today. *Jones* arose under the Federal Death Penalty Act of 1994 (18 USC § 3591 *et seq.*), which, as interpreted by the Court, provided that if the jury could not agree on a sentence the court would impose a sentence of "life imprisonment without possibility of release." The statute did not, however, say that the jury must be told the consequences of a deadlock in advance, and the Court declined to impose such a requirement, either as a matter of constitutional law or in the exercise of its supervisory power over federal courts. The Court rejected the petitioner's constitutional argument in the following language:

> "The truth of the matter is that the proposed [anticipatory deadlock] instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. Petitioner's argument, although less than clear, appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior. That contention has no merit. We have never suggested, for example, that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have

long been of the view that '[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.' *Allen* v. *United States*, 164 U.S. 492, 501 (1896). We further have recognized that in a capital sentencing proceeding, the Government has 'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.' *Lowenfield* v. *Phelps*, 484 U.S. 231, 238 (1988) (citation and internal quotation marks omitted). We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest" (527 US at 382).[7]

The Court in *Jones* also declined to require an anticipatory instruction on the consequences of deadlock in the exercise of its supervisory power over federal courts. It noted that the New Jersey Supreme Court had exercised its supervisory power to require such an instruction in *State v Ramseur* (106 NJ 123, 304-315, 524 A2d 188, 280-286 [1987]), but found the views of the state courts that had decided otherwise more persuasive. The Court in *Jones* quoted with approval the comment of the Virginia Supreme Court in *Justus v Commonwealth* (220 Va 971, 979, 266 SE2d 87, 92 [1980]), which noted that telling a jury that disagreement guaranteed a life sentence "would have been an open invitation for the jury to avoid its responsibility and to disagree."

*Jones* was a 5-4 decision. The dissenters in *Jones*, however, did not say they disagreed with the majority on the issue that is relevant here—whether the Constitution requires an anticipatory deadlock instruction to the effect that a hung jury guarantees life without parole. The dissent expressly refrained from taking issue with the majority on the question: Justice Ginsburg said, "I . . . see no cause to dispute that 'the Eighth Amendment does not require that the jury be instructed as to the consequences of their failure to agree' " (527 US at 417 n 20). The *Jones* dissenters did not even express disagreement

---

7. The Court pointed out in *Jones* (527 US at 382-383 n 6) that arguments similar to the petitioner's had previously been rejected by federal appellate courts in four circuits and accepted by none (*see Coe v Bell*, 161 F3d 320, 339-340 [6th Cir 1998]; *Green v French*, 143 F3d 865, 890 [4th Cir 1998]; *United States v Chandler*, 996 F2d 1073, 1088-1089 [11th Cir 1993]; *United States v Jones*, 132 F3d 232, 245 [5th Cir 1998]).

with the refusal of the *Jones* majority to require an anticipatory deadlock instruction as a matter of policy. (The basis for the dissent in *Jones*, insofar as it related to the deadlock issue, was that the instructions given in that case had misled the jury.) In short, the practice that the majority here finds to be mandatory under our State Constitution failed in *Jones* to gain the endorsement of any Justice.

Nor does the majority's interpretation of the State's Due Process Clause find the slightest support in New York history or precedent. The jury's role in New York capital sentencing goes back to 1933—not long before our present Constitution was adopted. Beginning in that year, juries in some capital cases were given the option of recommending leniency (L 1933, ch 773, § 1, amending Penal Law § 1250 [allowing juries to make nonbinding recommendation of prison sentence in kidnaping capital cases]; *see* Acker, *New York's Proposed Death Penalty Legislation: Constitutional and Policy Perspectives*, 54 Alb L Rev 515, 520 [1990]). Later statutes expanded the jury's role (L 1937, ch 67, § 2, adding Penal Law § 1045-a [allowing juries to make nonbinding recommendation of life sentence in depraved mind and felony murder cases]; L 1963, ch 994, §§ 1, 2, amending Penal Law §§ 1045, 1045-a [authorizing juries to make binding sentencing decisions in all types of first degree murder cases]; *see* Acker, *supra*, 54 Alb L Rev at 520, 523). None of these statutes, and no case decided under them, required that a capital jury be told that a deadlock would lead to life imprisonment. Nothing in New York law, before today, even hints that such a requirement might exist.

There is in short no basis in precedent for the constitutional requirement the majority creates today. The majority's decision is based on nothing but its own policy judgment. It speculates about juror speculation, opining that the absence of a deadlock instruction might lead jurors to fear a defendant "on the streets" (majority op at 128). This is, in our view, quite implausible. Why would a juror who is told nothing about the consequences of deadlock assume that, if the jury is unable to agree between the two choices of death or life without parole, the result will be defendant's return to society? The majority makes no attempt to answer this question. Yet the majority's fear of

that possibility is the sole basis on which it holds a statute enacted by the Legislature to be unenforceable.[8]

The majority declines to "craft" a new deadlock instruction, saying that "to do so would usurp legislative prerogative" (majority op at 131). This deference to the Legislature is not just in sharp contrast to the approach taken in the rest of the majority opinion; it is probably illusory, for the majority's opinion seems to leave only one possible deadlock instruction for the Legislature to "craft." Logically, the only instruction that can eliminate the danger the majority is concerned about—a juror's fear of the possibility of a defendant's release—is one that tells the jury that no such possibility exists. Thus, it seems that the only deadlock instruction the majority would uphold is one that tells the jury that a deadlock would result in life without parole— and that the majority is, in effect, telling the Legislature that the death penalty statute cannot be enforced until such an instruction is enacted.[9]

Of course, a policy argument can be made for that instruction. Telling a jury that a deadlock will result in a life without parole sentence will indeed eliminate the possibility that the fear of a defendant's parole will motivate a recalcitrant juror to accept a death sentence. But by the same token, it will offer an incentive for juror recalcitrance. It tells each juror, in effect, that he or she may sit as a jury of one, and achieve a life without parole sentence by refusing to deliberate. In short, the Court's preferred instruction has both advantages and disadvantages, and it should be the Legislature's preference, not this Court's, which prevails.

The majority would certainly not set the Legislature's wishes aside so readily in a noncapital case. The majority's premise is that, because of the unique severity and finality of a sentence of

---

**8.** The majority says that "the studies previously cited indicate" that the kind of juror speculation it foresees is likely to occur (majority op at 128). But those studies indicate nothing of the kind. The studies are concerned with juror attitudes toward a verdict of life or death and show nothing about the extent to which juries anywhere speculate about the consequences of a deadlock, when they are not told what those consequences are.

**9.** The majority's logic also requires that the jury have the option of imposing a life without parole sentence. If, by rejecting a death sentence, the jury would make the defendant's future release on parole a possibility, then that possibility might influence some jurors to vote for death. The majority's logic thus implies that every Supreme Court Justice was wrong to say, in *Simmons*, that a jury may be given accurate information to the effect that a defendant will be eligible for parole in the event of a life sentence (*see supra* at 138-139).

death, a defendant must be given every possible opportunity to escape from it. We do not criticize the majority's obvious discomfort with the death penalty—indeed, we may share that discomfort. It is true that the death penalty is uniquely severe, and irreversible once carried out, and we recognize that its application is subject to many established constitutional limitations. But all these limitations, we believe, were scrupulously observed in the enactment of New York's death penalty statute. By devising a novel limitation—a new constitutionally-required way of weighting the balance in the defendant's favor—the majority has gone much further than anything in death penalty jurisprudence, or the principles underlying it, can justify. Today's decision, in our view, elevates judicial distaste for the death penalty over the legislative will.

## III

Accordingly, we dissent from the conclusions of the majority that the provision of CPL 400.27 (10) for an anticipatory deadlock instruction is unconstitutional and that New York's death penalty statute is unenforceable pending further legislative action.

Chief Judge KAYE and Judges CIPARICK and ROSENBLATT concur with Judge G.B. SMITH; Judge ROSENBLATT concurs in a separate concurring opinion; Judge R.S. SMITH dissents in another opinion in which Judges GRAFFEO and READ concur.

Judgment modified, etc.